[No. B227360. Second Dist., Div. Three. Mar. 29, 2011.]

JSM TUSCANY, LLC, et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondents;
NMS PROPERTIES, INC., et al., Real Parties in Interest.

**COUNSEL**

Tourtelot & Butler and Robert H. Tourtelot for Petitioners.

No appearance for Respondents.

Manly & Stewart, John C. Manly and Morgan A. Stewart for Real Parties in Interest.

**OPINION**

**CROSKEY, Acting P. J.**—In these writ proceedings, we consider the trial court's denial, without prejudice, of petitioners'[1] motion to compel arbitration

---

[1] The petitioners are Craig D. Jones; JSM Modena, LLC; JSM Tuscany, LLC; JSM Spoleto, LLC; JSM Lugano, LLC; JSM Genoa, LLC; JSM Roma, LLC; JSM Lucca, LLC; JSM Arrezo, LLC; JSM Positano, LLC; JSM San Marco, LLC; and JSM Construction, Inc. (collectively, petitioners). It appears that these entities are all owned and/or controlled by Jones.

pursuant to the provisions of three separate, but substantially identical, real estate purchase contracts. Petitioners are 12 of the 27 defendants named in the first amended complaint (the operative pleading before us) filed by the four plaintiffs, N. Neil Shekhter; NMS Properties, Inc.; 15394 NM, LLC; and NMS/JSM San Lorenzo, LLC.[2]

Plaintiffs' complaint, although pleading some 16 causes of action, essentially seeks recovery of damages and other relief from the several defendants for their breach of the three real estate sales contracts (hereinafter, PSA's) and the failure of some of the defendants to meet the requirements of three related deed restriction (Deed Restriction) agreements that those defendants had entered into with the City of Santa Monica, and as to one of which two of the plaintiffs, 15394 NM or NMS/JSM San Lorenzo, claim to be third party beneficiaries.

The three PSA's each contained a broad arbitration clause which petitioners moved to enforce. The trial court denied the motion to compel arbitration on the grounds that not all of the plaintiffs and only a small number of the defendants were actually signatories to the PSA's. In addition, the Deed Restriction agreements entered into by several of the defendants and the City of Santa Monica contained no arbitration clause, and the trial court concluded that those agreements were not dependent on or intertwined with the PSA's, thus giving rise to nonarbitrable disputes.

After reviewing the record in this factually complex matter, we conclude that the trial court did not have before it sufficient information to determine whether plaintiffs should be compelled to arbitrate and therefore properly denied the motion to compel without prejudice. We will therefore deny the petition and remand the matter with directions.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

Preliminarily, we note that while, in broad outlines, this case appears to be a dispute between Jones and Jones-related entities on one side and Shekhter and Shekhter-related entities on the other, this is not necessarily the case. The

---

[2] It appears that Shekhter owns and/or controls each of the other three plaintiff entities.

[3] The facts that we recite are taken primarily from plaintiffs' first amended complaint and the exhibits attached thereto. As discussed in greater detail below, there are substantial gaps in the documentation.

Jones-related entities generally include "JSM" in their names, while the Shekhter-related entities begin with "NMS." One of the plaintiffs, however, is named NMS/JSM San Lorenzo, a name which suggests that, perhaps, at one point, Jones and Shekhter may have been in business together.[4] In any event, it is apparent that the NMS/JSM San Lorenzo entity is now aligned with Shekhter and the other Shekhter-related plaintiffs.

JSM Construction, a Jones-related entity, was an active real estate developer in the City of Santa Monica (the City). In or about 2004 and 2005, JSM Construction was granted administrative approval to develop four mixed-use buildings,[5] each to include dozens of residential rental units. The properties were to be located at 626 Broadway, 1548 6th Street, 1418 7th Street, and 1539 4th Street in the City. The City's administrative approvals were subject to certain conditions, one of which related to the provision of affordable housing units. JSM Construction could satisfy these conditions by paying an in-lieu fee, dedicating onsite affordable housing units in each of the projects, constructing offsite affordable housing units, or acquiring land for affordable housing. As we shall soon discuss, JSM Construction chose to satisfy this obligation by means of the construction of offsite affordable housing units.

At approximately the same time, Jones contracted to sell to Shekhter, for $4 million, a "deed restricted" affordable housing apartment building in the City. The contract was originally dated November 11, 2004, and pertained to the sale of "1244 [6th] Street, or, in the sole discretion of Seller, such other property reasonably comparable in size and location developed by Seller [with a deed restricted affordable housing apartment building]." On or about September 15, 2005, the agreement was amended to designate the property to be sold as the property located at 711 Colorado Avenue. Pursuant to the 711 Colorado PSA, Shekhter paid a $500,000 deposit toward the total purchase price of $4 million. The PSA provided that Jones was to develop and construct a low-income deed restricted apartment building on the 711 Colorado property,

---

[4] The operative complaint is of no assistance in this regard, alleging only that NMS/JSM San Lorenzo is "a California limited liability company" which "is, and at all times mentioned herein, was qualified to do business and doing business in the State of California, with its principal place of business in the County of Los Angeles, City of Los Angeles, California." The next sentence of the complaint, which was perhaps intended to explain this entity's role in the dispute, is instead a repeat of the sentence describing the role of 15394 NM, a different plaintiff.

[5] The administrative approval permit numbers are AA05-004, AA04-027, AA04-018 and AA04-026. We assume the first two digits of the numbers refer to the year that the permits were issued.

and that escrow would close on the sale to Shekhter within 60 days after the City issued a certificate of occupancy for the project.

JSM Construction then agreed with the City that it would satisfy its affordable housing requirements with respect to the properties at 626 Broadway, 1548 6th Street, 1418 7th Street, and 1539 4th Street, by constructing the necessary amount of affordable housing units at 711 Colorado. Pursuant to the City's requirements, a deed restriction was to be recorded on the property to insure that the offsite affordable housing units would be maintained for 55 years.

JSM Construction's agreement with the City was memorialized in a Deed Restriction agreement dated April 2, 2007.[6] Pursuant to the Deed Restriction agreement, JSM Construction and JSM Modena, the Jones-related entity which, by this time, owned 711 Colorado, agreed to "provide and maintain" 26 affordable housing units on the 711 Colorado property. However, the Deed Restriction agreement did not set forth any particular schedule for performance; it did not indicate *when* (if ever) the affordable housing units would be built. Instead, the Deed Restriction agreement provided that it ran with the property, and would "apply to and bind the heirs, successors and assigns of all the parties hereto and shall run with and burden the 711 Colorado Property for the benefit of the City, the public, and surrounding landowners . . . . [JSM Modena] shall expressly make the conditions and covenants contained in this Agreement a part of any deed or other instrument conveying any interest in the property."

By this Deed Restriction agreement, JSM Construction was permitted to develop the four properties at 626 Broadway, 1548 6th Street, 1418 7th Street, and 1539 4th Street as *market-rate* rental apartment buildings, as the City's requirements relating to affordable housing were to be satisfied by the affordable housing to be constructed on JSM Modena's property at 711 Colorado. For this reason, we refer to the four properties as the Modena-benefitted properties, and 711 Colorado as the Modena affordable housing property. Two of the Modena-benefitted properties, 1548 6th Street and 1539 4th Street, are now owned by two (Shekhter-related) plaintiffs in this case, NMS/JSM San Lorenzo and 15394 NM, respectively. The remaining two Modena-benefitted properties are owned by Jones-related entities (JSM

---

[6] Although the record before us indicates that the other two Deed Restriction agreements at issue in this case were recorded, there is no indication in the record as to whether this Deed Restriction agreement was recorded.

Lugano and JSM Genoa).[7] The record does not indicate how or when the Shekhter-related plaintiffs became owners of two of the Modena-benefitted properties.[8]

The affordable housing project was never constructed on the 711 Colorado property; the parties eventually agreed that the cost of construction would exceed the $4 million original purchase price. On May 18, 2009, the parties entered into an amendment and assignment of the PSA. The amendment indicated that the sellers were now Jones and JSM Modena, while the buyer became Shekhter-related entity (and plaintiff) NMS Properties. Pursuant to the terms of the amendment, Jones would no longer construct the affordable housing project on 711 Colorado. Instead, the property to be conveyed would consist of the property itself, all plans and specifications for the construction of the affordable housing project, any development rights related to the development project, and Jones's rights under agreements with architects, engineers, and consultants regarding the project. The purchase price was to consist solely of the buyer's assumption of a note (and security documents) on the property, and the $500,000 deposit was to be refunded at closing. Moreover, the parties would subsequently agree on a payment to be made by the sellers to the buyer to cover the costs of construction in excess of the original purchase price. Escrow was to close within five days of the buyer giving notice that it was prepared to close, but not later than November 1, 2009.

We pause at this moment for two important points. First, the amendment indicates that, if there was no agreement reached on the amount of the excess costs to be paid by the sellers, the buyer could unilaterally terminate the terms of the amendment, which would reinstate the terms of the initial agreement. There is no allegation, or evidence, that this was done. Instead, plaintiffs filed suit on the PSA *as amended*. Second, as expressed above, the Deed Restriction *ran with the land*. Thus, it was apparently contemplated at

---

[7] The properties are alleged to be owned by JSM Lugano, PRU/JSM Lugano, JSM Genoa and PRU/JSM Genoa. The "PRU/JSM" entities include the involvement of Prudential Investment Management, Prudential Financial Services, Inc., and/or Prudential Real Estate Investors, Inc. There are a total of nine Prudential-related entities that are named as defendants in this case. They originally brought a motion to compel arbitration which was denied; they did not seek writ review. As they are not parties to this writ proceeding (although they apparently fully support petitioners' position), we discuss their involvement only as related to petitioners' motion to compel arbitration.

[8] We do not know, for example, if any transfer from Jones to Shekhter of two of the Modena-benefitted properties was part of the overall transaction which was intended to transfer the Modena affordable housing property to Shekhter. Nor do we know if any transfer of the Modena-benefitted properties made reference to an obligation to construct the affordable housing at Modena. Moreover, as referenced above, the San Lorenzo entity which owns one of the Modena-benefitted properties has a name, "NMS/JSM San Lorenzo," which suggests, at least, that Jones may have had an interest in the entity at one time.

this point that NMS Properties, as the future owner of 711 Colorado, would be responsible for constructing the affordable housing project on that property in accordance with the Deed Restriction.

We have set forth the factual history of this dispute with regard to the 711 Colorado property. The dispute repeated with respect to two additional parcels, with one important difference: *none* of the properties benefitted by the other contemplated affordable housing projects are owned by plaintiffs; instead, they are all owned by defendants. We discuss these properties briefly.

In November 2004, Jones agreed to sell to Shekhter a property at 1514 7th Street (which, before the transfer, became owned by JSM Tuscany) on which there was to be constructed a deed restricted affordable housing project, for $3.75 million, including a $500,000 deposit. On March 15, 2007, JSM Construction and JSM Tuscany entered into a Deed Restriction agreement with the City similar in terms to the Modena Deed Restriction. In this case, the four Tuscany-benefitted projects were located at 606 Broadway, 1420 5th Street, 1442 5th Street, and 507 Wilshire Boulevard. These projects are all owned by Jones-related entities, JSM Positano, JSM San Marco and JSM Arrezo.[9] On May 18, 2009, the 1514 7th (Tuscany) PSA was amended in terms virtually identical to that of the 711 Colorado (Modena) PSA— the sellers were now Jones and JSM Tuscany; the buyer was now NMS Properties; the property to be conveyed was the 1514 7th property with all plans, development rights, and other paperwork; the sale price would be the assumption of an existing note; the deposit would be returned; there would be an additional payment from the seller for the construction costs in excess of the original sales price; and the agreement would close five days after buyer was prepared to do so, but no later than November 1, 2009.

In November 2006, Jones agreed to sell to Shekhter a property at 1437 5th Street (which, before the transfer, became owned by JSM Spoleto) on which there was to be constructed a deed restricted affordable housing project, for $4.25 million, including a $750,000 deposit. On May 18, 2009, the 1437 5th PSA was amended in terms virtually identical to that of the other two PSA's—the sellers were now Jones and JSM Spoleto; the buyer was now NMS Properties; the property to be conveyed was the 1437 5th property with all plans, development rights, and other paperwork; the sale price would be the assumption of an existing note; the deposit would be returned; there would be an additional payment from the seller for the construction costs in excess of the original sales price; and the agreement would close five days after the buyer was prepared to do so, but no later than November 1, 2009.

---

[9] Plaintiffs' complaint does not identify an owner of the 1442 5th Street property.

On June 18, 2009,[10] JSM Construction and JSM Spoleto entered into a Deed Restriction agreement with the City similar in terms to the Modena and Tuscany Deed Restrictions.[11] In this case, the three Spoleto-benefitted projects were located at 1241 5th Street, 1427 7th Street, and 525 Broadway. These projects are all owned by Jones-related entities, JSM Roma, JSM Lucca and a Prudential/JSM entity, respectively.

According to plaintiffs, defendants breached the amended PSA's, by failing to turn over the properties and related documents as agreed, and failing to refund the deposits. This is not meant, however, to be a comprehensive enumeration of defendants' alleged wrongdoing.

Because the facts of this case are so complex, we now briefly summarize the roles played by all parties. (1) Plaintiff Shekhter was the original buyer in all three PSA's; by amendment to the PSA's, he assigned his rights under each PSA to NMS Properties. Although Shekhter appears to have an interest in the other plaintiff entities, it is not entirely clear on what basis he seeks relief as an individual—particularly with respect to his breach of contract causes of action. (2) Plaintiff NMS Properties was, by virtue of assignment from Shekhter, the buyer of the three (Modena, Tuscany and Spoleto) affordable housing properties (land only), pursuant to the amended PSA's. (3) Plaintiffs 15394 NM and NMS/JSM San Lorenzo owned Modena-benefitted properties, identified in the Modena Deed Restriction agreement as properties which could be developed as market-rate rentals without affordable housing units due to the construction of the Modena affordable housing project at 711 Colorado.

We now discuss defendants and petitioners. (1) Defendant and petitioner Jones was a seller of the three affordable housing properties, pursuant to the original and amended PSA's; he also has an interest in the other defendants and petitioners. (2) Defendants and petitioners JSM Modena, JSM Tuscany and JSM Spoleto were additional sellers of the three affordable housing properties, pursuant to the amended PSA's; they were also parties to the Deed Restriction agreements with the City. (3) Defendant and petitioner JSM Construction was a party to the Deed Restriction agreements with the City. (4) The remaining defendants and petitioners each own properties, identified in the Deed Restriction agreements, which were to be benefitted by the affordable housing projects. JSM Lugano and JSM Genoa were Modena-benefitted properties; JSM Positano, JSM San Marco and JSM Arrezo were

[10] We note here that the Deed Restriction agreement was entered into *after* the parties had agreed that it would be NMS Properties, not JSM Construction, that would construct the affordable housing project at 1437 5th.

[11] The copy of the Spoleto Deed Restriction agreement provided to this court in petitioners' exhibits in support of their petition is cut off after the eighth page; the other two Deed Restriction agreements are 23 pages in length.

Tuscany-benefitted properties; and JSM Roma and JSM Lucca were Spoleto-benefitted properties. These benefitted-property defendants were sued on the basis that they received wrongfully diverted funds (the deposits made by plaintiffs under the PSA's) and for breach of the Deed Restriction agreements.[12]

The plaintiffs filed this action on February 24, 2010. The first amended complaint (which is the one with which we are concerned) was filed on April 30, 2010.[13] Plaintiffs' 66-page first amended complaint alleges 16 causes of action, sounding in tort and contract. Plaintiffs' opposition to the motion to compel, and their opposition to petitioners' writ petition, narrow their focus to four bases[14] for relief: (1) claims for breach of the PSA's; (2) claims for breach of the Deed Restriction agreements; (3) claims that defendants used the wrongfully retained deposit amounts (from the PSA's) to develop their other projects; and (4) claims that defendants wrongfully encumbered the Tuscany and Modena properties (recording deeds of trust in favor of Robhana, Inc., and Charles Dunn Capital, Inc.) which should have been clear of trust deeds and transferred to plaintiffs pursuant to the amended PSA's. Plaintiffs also named as a defendant Integrated Lender Services, the trustee on those deeds of trust. We refer to these three defendants collectively as the "Trust Deed Defendants." Plaintiffs allege that all defendants but the three

---

[12] Try as we might, this court cannot determine on what basis plaintiffs could possibly recover against the benefitted-property defendants for breach of the Deed Restriction agreements. By the language of the Deed Restriction agreements themselves, these defendants were, at best, third party beneficiaries of the Deed Restriction agreements, and owed no duties under the agreements to anyone. Plaintiffs, who were to have been the eventual owners of the affordable housing projects which would have benefitted the benefitted-property defendants, and (with respect to the Modena Deed Restriction agreement) were two *other* third party beneficiaries of the Deed Restriction agreements, do not clearly explain the basis on which they can recover against third party beneficiaries for breach of the Deed Restriction agreements. In the operative complaint, plaintiffs variously allege that these defendants "received a favorable deed restriction"; breached the Deed Restriction agreements "by failing to construct the properties as required"; were developed (if developed) "at the benefit and to the detriment of" the related affordable housing projects; and "received market rate housing units, without an affordable component." While plaintiffs' allegations are not clear as to whether the benefitted properties were, in fact, developed (as the benefitted-property defendants are apparently sued both for failing to develop and for developing their properties), we fail to see how a third party beneficiary of a contract can be liable for breaching that contract simply by receiving (or not receiving) the benefits to which it was entitled under the contract.

[13] Apparently, defendants not only sought to compel arbitration, but also filed a demurrer to the first amended complaint, which was sustained with leave to amend. Plaintiffs filed their second amended complaint on September 13, 2010. That pleading, however, is not before us and is not relevant to the issues presented by the pending petition for a writ of mandate.

[14] In their opposition to the writ petition, plaintiffs argue, for the first time, that their cause of action seeking injunctive relief under Business and Professions Code section 17200 cannot be subject to arbitration. As this argument was never raised before the trial court, we decline to address it.

Trust Deed Defendants have an alter ego relationship with Jones and are merely conduits through which he conducts his construction and development business.

On April 16, 2010 (two weeks prior to the filing of the first amended complaint), the Prudential defendants filed a motion to compel arbitration, based on the arbitration clause in the PSA's. Petitioners filed a notice of joinder in that motion on June 17, 2010. Each of the PSA's contained the same very broad arbitration clause:[15] "*Any disagreement or dispute* between the Parties *with reference to the interpretation, performance or breach of any provisions of the Agreement, this Addendum, or any Exhibit to the Agreement or this Addendum*, shall, at the request of either Party, be resolved by binding arbitration, and any award shall include reasonable attorney's fees and costs to the prevailing party. The arbitrator shall apply California substantive law and the California Evidence Code to the proceeding. The arbitrator shall not have the power to commit errors of law or legal reasoning, nor shall the arbitrator have the power to make an award that would not have been available in a Court of Law had the Parties chosen to litigate rather than arbitrate. The award may be vacated or corrected pursuant to California Code of Civil Procedure, Sections 1286.2 or 1286.6 for any such error or for any such award in excess of the arbitrator's power. Each Party to such arbitration shall have all rights of discovery permitted by the California Code of Civil Procedure, and in this regard, the Parties hereby incorporate and make a part hereof the provisions of Code of Civil Procedure, Section 1283.05 and 1283.1.

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED HEREIN DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED HEREIN. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY." (Italics added.)

---

[15] The PSA's were standard form contracts, with the bulk of the printed provisions stricken and a separately drafted addendum attached. The arbitration clause was contained in the separately drafted addendum. There is no suggestion that the clause was not intentionally agreed upon by the parties.

The trial court ruled on the motion to compel arbitration on July 22, 2010. Noting that only two of the four plaintiffs and five of the 27 defendants were signatory parties to one or more of the PSA's (the only agreements containing an arbitration clause) and concluding that some of the claims asserted by plaintiffs did not arise from conduct involving the PSA's, the trial court denied the motion, without prejudice. It explained its reasoning, in part, as follows: "Here, it is clear that the claims generally concern the [PSA's]. However, there are claims which also concern the restricted deed agreements entered with the [C]ity, which do not contain an arbitration clause, and cannot be deemed to fall within the ambit of the purchase and sale agreements. Thus, some claims are clearly arbitrable, while others are not. And, some parties are subject to arbitration, while others are not. This case is not one where application of the doctrine of equitable estoppel makes sense, given the existence of wholly distinct contract claims which are not subject to arbitration. Further, there is a very real possibility of conflicting rulings as to the entities which are not parties to these motions, and are not parties to the arbitration agreements. As such, this case is appropriately one where the Court must deny arbitration under CCP § 1281.2(c)."[16]

Petitioners did not notice an appeal, but rather filed the pending petition for writ relief. Their petition raises issues involving unusual, if not novel, circumstances concerning the application of Code of Civil Procedure section 1281.2, subdivision (c) as well as the needs of judicial economy.

---

[16] Code of Civil Procedure, section 1281.2, provides, in relevant part as follows: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] . . . [¶] (c) A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact. . . . [¶] If the court determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner's contentions lack substantive merit. [¶] If the court determines that there are other issues between the petitioner and the respondent which are not subject to arbitration and which are the subject of a pending action or special proceeding between the petitioner and the respondent and that a determination of such issues may make the arbitration unnecessary, the court may delay its order to arbitrate until the determination of such other issues or until such earlier time as the court specifies. [¶] If the court determines that a party to the arbitration is also a party to litigation in a pending court action or special proceeding with a third party as set forth under subdivision (c) herein, the court (1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action or special proceeding."

## ISSUES PRESENTED

There are essentially four issues presented by these writ proceedings. First, is relief by writ of mandate, rather than appeal, appropriate in the particular circumstances of this case? We conclude that it is. Second, may defendants that are not signatories of the agreements containing an arbitration clause enforce the arbitration clause contained therein against signatory party plaintiffs that have filed suit on claims arising under the agreements? Existing law establishes that they may. Third, may nonsignatory *plaintiffs* that have joined in the action to assert claims based upon or arising out of the alleged breach of the contracts containing the arbitration clauses also be compelled to arbitrate, even by defendants that are not themselves signatory parties to the contracts containing the arbitration clauses? We conclude, as a matter of first impression, that they may. Finally, are *all* of the causes of action alleged by plaintiffs, including those for breach of the Deed Restriction agreements, inextricably intertwined with the obligations under the PSA's? We conclude that, on the record before us, a definitive answer to that question is not possible.

## DISCUSSION

### 1. Standard of Review

There are two different critical written agreements before us and there is no dispute as to their provisions. We are thus presented with legal issues to resolve, not factual ones. When "the language of an arbitration provision is not in dispute, the trial court's decision as to arbitrability is subject to de novo review." (*Gravillis v. Coldwell Banker Residential Brokerage Co.* (2006) 143 Cal.App.4th 761, 771 [49 Cal.Rptr.3d 531].) Thus, in cases where "no conflicting extrinsic evidence is introduced to aid the interpretation of an agreement to arbitrate, the Court of Appeal reviews de novo a trial court's ruling on a petition to compel arbitration." (*California Correctional Peace Officers Assn. v. State of California* (2006) 142 Cal.App.4th 198, 204 [47 Cal.Rptr.3d 717].)

This principle finds expression in many cases. (See, for extensive list of such authorities, *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 707 [111 Cal.Rptr.3d 876].) Thus, we review the trial court's order under a de novo standard.

### 2. Review by Writ Is Appropriate

■ In *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 113 [40 Cal.Rptr.2d 839, 893 P.2d 1160], our Supreme Court stated, "Mandate is

available to review an appealable judgment only when the remedy by appeal would be inadequate *or* the issues presented are of great public importance and must be resolved promptly." (Italics added.) The "or" is significant here, as it implies that even when the remedy by appeal *would be* adequate, writ review may nonetheless be available if the issues are important enough to require prompt resolution. Subsequent cases have confirmed this interpretation.

■ In *Rodrigues v. Superior Court* (2005) 127 Cal.App.4th 1027 [26 Cal.Rptr.3d 194], the court was considering a writ petition from an order granting a motion to set aside a default and default judgment under Code of Civil Procedure section 473, subdivision (b). The order had granted relief based on a declaration of attorney fault by an attorney who was not licensed to practice in California. The issue was whether the mandatory relief provisions of Code of Civil Procedure section 473, subdivision (b) applied to foreign attorneys. (*Rodrigues v. Superior Court, supra*, 127 Cal.App.4th at p. 1029.) The court acknowledged that an order vacating a default judgment and setting aside the default is itself appealable. (*Id.* at p. 1032.) "However," the court stated, "writ review of an appealable order is appropriate where it is necessary to resolve an issue of first impression promptly and to set guidelines for bench and bar. [Citations.] For these reasons, writ review is appropriate in the present case." (*Ibid.*) Similarly, in *Elden v. Superior Court* (1997) 53 Cal.App.4th 1497, 1504 [62 Cal.Rptr.2d 322], the court allowed writ review of an order denying a petition to confirm an arbitration award, as the petition raised a novel issue of law. The issues raised by the instant petition are similarly novel and important, rendering writ review appropriate.[17]

### 3. Signatory Parties May Be Compelled to Arbitrate Their Claims Against Nonsignatory Parties

■ "Generally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it." (*Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.* (2005) 129 Cal.App.4th 759, 763 [28 Cal.Rptr.3d 752] (*Westra*); see *Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1284 [63 Cal.Rptr.3d 787] (*Rowe*).) "There are exceptions to the general rule

---

[17] Moreover, we note that there are substantial issues of urgency when the case involves the development of property. In an environmental case involving issues under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 20000 et seq.), the court noted that in such cases, "time is money. A project opponent can 'win' even though it 'loses' in an eventual appeal because the sheer extra time required for the unnecessary appeal (with the risk of higher interest rates and other expenses) makes the project less commercially desirable, perhaps even to the point where a developer will abandon it or drastically scale it down." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 6 [6 Cal.Rptr.3d 286].) We have an analogous concern here.

that a nonsignatory to an agreement cannot be compelled to arbitrate and cannot invoke an agreement to arbitrate, without being a party to the arbitration agreement." (*Westra, supra,* 129 Cal.App.4th at p. 765; see *Rowe, supra,* 153 Cal.App.4th at p. 1284.)

One pertinent exception is based on the doctrine of equitable estoppel. (*Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 268 [25 Cal.Rptr.3d 440] (*Boucher*); *Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 220 [92 Cal.Rptr.3d 534] (*Goldman*); see generally, Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2010) ¶¶ 5:266.10 to 5:266.25, pp. 5-190 to 5-193 (rev. # 1, 2010).) Under that doctrine, as applied in "both federal and California decisional authority, a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations." (*Boucher, supra,* 127 Cal.App.4th at p. 271; see *Goldman, supra,* 173 Cal.App.4th at pp. 217–218.) "By relying on contract terms in a claim against a nonsignatory defendant, even if not exclusively, a plaintiff may be equitably estopped from repudiating the arbitration clause contained in that agreement." (*Boucher, supra,* 127 Cal.App.4th at p. 272; see *Goldman, supra,* 173 Cal.App.4th at p. 220.) "The rule applies to prevent parties from trifling with their contractual obligations."[18] (*Turtle Ridge Media Group, Inc. v. Pacific Bell Directory* (2006) 140 Cal.App.4th 828, 833 [44 Cal.Rptr.3d 817] (*Turtle Ridge*).)

In *Boucher, supra,* 127 Cal.App.4th 262, the plaintiff sued Alliance Title Company, Inc. (Alliance), and Financial Title Company (Financial) in connection with a purported breach of his employment agreement with Financial. (*Id.* at p. 265.) Both defendants petitioned to compel arbitration under an arbitration clause in the employment agreement. The trial court denied Alliance's petition, on the ground that it was not a signatory to the employment agreement. The Court of Appeal reversed. The *Boucher* court concluded that, under federal law, a signatory of an arbitration clause may be compelled to arbitrate against a nonsignatory when the relevant causes of action rely on and presume the existence of the contract containing the arbitration provision. (*Id.* at p. 269.) In other words, a plaintiff who relies on the contractual terms in a claim against a nonsignatory may be precluded from repudiating the arbitration clause in the contract. (*Id.* at p. 272.) The court held that the plaintiff in *Boucher* was estopped from avoiding arbitration with Alliance,

---

[18] Where the equitable estoppel doctrine applies, the nonsignatory has a right to enforce the arbitration agreement. (*Rowe, supra,* 153 Cal.App.4th at p. 1290.) In such cases, the nonsignatory is not a "third party" within the meaning of Code of Civil Procedure section 1281.2, subdivision (c), and that provision simply does not apply. (*Laswell v. AG Seal Beach, LLC* (2010) 189 Cal.App.4th 1399, 1407–1408 [117 Cal.Rptr.3d 310].)

because his claims against Alliance relied on, made reference to, and presumed the existence of the employment agreement. (*Id.* at pp. 272–273.)

Other California courts, applying federal law, have embraced the estoppel theory, holding that a signatory plaintiff who sues on a written contract containing an arbitration clause may be estopped from denying arbitration if he sues nonsignatories as related or affiliated persons with the signatory entity. (*Turtle Ridge, supra,* 140 Cal.App.4th at p. 833; *Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1713–1714, 1716–1717 [1 Cal.Rptr.3d 328] (*Metalclad*).) As the court in *Turtle Ridge* explained: " '[T]he equitable estoppel doctrine applies when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are " 'based on the same facts and are inherently inseparable' " from arbitrable claims against signatory defendants.' " (*Turtle Ridge, supra,* at p. 833, quoting *Metalclad, supra,* at pp. 1713–1714.) Claims that rely upon, make reference to, or are intertwined with claims under the subject contract are arbitrable. (*Boucher, supra,* 127 Cal.App.4th at pp. 269–270.)

Thus, a nonsignatory defendant may compel a signatory plaintiff to arbitrate under the doctrine of equitable estoppel. For the doctrine to apply, "the claims plaintiff asserts against the nonsignatory must be dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause." (*Goldman, supra,* 173 Cal.App.4th at pp. 217–218.) "This requirement comports with, and indeed derives from, the very purposes of the doctrine: to prevent a party from using the terms or obligations of an agreement as the basis for his claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of that same agreement." (*Id.* at p. 221.) Application of the doctrine in a proper case is not unfair to signatory plaintiffs resisting arbitration: Not only have such plaintiffs "decided the theories on which to sue" the nonsignatory, they also have "consented to arbitrate the claims against [the signatory defendant] anyway." (*Rowe, supra,* 153 Cal.App.4th at p. 1290.)

"Courts applying equitable estoppel against a signatory have 'looked to the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were " ' "intimately founded in and intertwined with the underlying contract obligations." ' " ' " (*Metalclad, supra,* 109 Cal.App.4th at p. 1713.) Application of "the estoppel doctrine in this context does not require a conscious or subjective intent to avoid arbitration, but turns upon the nexus between the contract and the causes of action asserted." (*Rowe, supra,* 153 Cal.App.4th at p. 1289.) "The focus is on the nature of the claims asserted by the plaintiff against the nonsignatory

defendant." (*Boucher, supra*, 127 Cal.App.4th at p. 272.) "Claims that rely upon, make reference to, or are intertwined with claims under the subject contract are arbitrable." (*Rowe*, at p. 1287.)

"Because equitable estoppel applies only if [the] plaintiffs' claims against the nonsignatory are dependent upon, or inextricably bound up with, the obligations imposed by the contract plaintiff has signed with the signatory defendant, we examine the facts alleged in the complaints." (*Goldman*, 173 Cal.App.4th at pp. 229–230.)

Based on these authorities, it is clear that the signatory plaintiffs, Shekhter[19] and NMS Properties, can be compelled to arbitrate all of their claims against signatory and nonsignatory defendants alike, to the extent that those claims are dependent upon, or inextricably intertwined with, the obligations imposed by the PSA's. We will turn to this latter question after we first consider whether the nonsignatory plaintiffs can also be compelled to arbitrate such claims.

### 4. *Nonsignatory Plaintiffs May Be Required to Arbitrate Claims Arising from Contract Containing Arbitration Clause*

The novel question raised by this writ petition is whether the nonsignatory plaintiffs (15394 NM and NMS/JSM San Lorenzo) can also be required to arbitrate their claims which are dependent upon, or inextricably intertwined with, the obligations imposed by the PSA's. We conclude that the rationale of the authorities discussed above applies equally to nonsignatory plaintiffs that bring such causes of action.

We are concerned with the doctrine of equitable estoppel. When a plaintiff brings a claim which *relies on contract terms* against a defendant, the plaintiff may be equitably estopped from repudiating the arbitration clause contained in that agreement. (*Boucher, supra*, 127 Cal.App.4th at p. 272; *Goldman, supra*, 178 Cal.App.4th at p. 220.) There is no reason why this doctrine should not be equally applicable to a nonsignatory plaintiff. When

---

[19] Shekhter asserts that, as he assigned his rights under the PSA's to NMS Properties, he is no longer a signatory of those agreements. However, plaintiffs' complaint makes no effort to exclude Shekhter from plaintiffs suing on the PSA's, and, at one point, appears to allege a breach of the *initial* PSA's, rather than the amended PSA's. (Plaintiffs allege Jones, JSM Modena, JSM Tuscany and JSM Spoleto breached the PSA's by failing to develop the affordable housing projects—an obligation required by the initial PSA's, but not the amended ones.) As Shekhter is suing on the PSA's, and appears to, at least in part, assert breach of the initial PSA's to which he was a party, we conclude that he is necessarily a signatory.

that plaintiff is suing on a contract—on the basis that, even though the plaintiff was not a party to the contract, the plaintiff is nonetheless entitled to recover for its breach, the plaintiff should be equitably estopped from repudiating the contract's arbitration clause. (Cf. *Crowley Maritime Corp. v. Boston Old Colony Ins. Co.* (2008) 158 Cal.App.4th 1061, 1070–1071 [70 Cal.Rptr.3d 605] (*Crowley*) [indicating federal law applies estoppel in such circumstances when the nonsignatory received direct benefits under the contract]; see also *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 84 [100 Cal.Rptr.2d 683] [stating that no person can be permitted to adopt that part of a contract which is beneficial to him or her and simultaneously reject its burdens, including the burden to arbitrate].)

This is particularly true where, as appears to be the case here, all of the plaintiffs, signatory and nonsignatory, are related entities. A nonsignatory can be compelled to arbitrate when a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to arbitrate as well. (*Crowley, supra,* 158 Cal.App.4th at pp. 1069–1070.) Additionally, a nonsignatory can be compelled to arbitrate when it is suing as a third party beneficiary of the contract containing the arbitration clause (*id.* at p. 1069); this too weighs in favor of enforcing the arbitration clause in this case.[20]

---

[20] In our analysis, we place the greatest emphasis on the theory of (1) equitable estoppel of a plaintiff *suing on a contract* rather than the (2) binding of entities that are in some way related to a signatory party or are third party beneficiaries of the contract, although we note that the two approaches are ultimately nearly identical. This is so because it is difficult to conceive of a situation in which a nonsignatory party can state a valid claim *based on the contract,* without having some legal relationship with a signatory of the contract or being a third party beneficiary of the contract.

Thus, for example, in *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237 [54 Cal.Rptr.2d 628], the court considered the situation in which a plaintiff, who had been hit by a car, sued her health insurer for medical malpractice as well as other defendants allegedly liable for the accident. The codefendants brought claims for equitable indemnity against the insurer, who moved to compel arbitration of the plaintiff's action and the codefendants' cross-actions. While the plaintiff's action against the insurer was clearly arbitrable, as the insurance contract contained an arbitration clause, the codefendants' cross-actions were not. The court concluded that the codefendants could not be compelled to arbitrate because there was no preexisting relationship between the codefendants and the insured plaintiff which would have enabled the insured plaintiff to bind them when she agreed to the arbitration clause. (*Id.* at p. 243.) Yet, the same result could have been reached on the theory that the codefendants' cross-actions against the health insurer were not based on the *contract* between the insurer and the plaintiff.

Consider also the language in *Crowley, supra,* 158 Cal.App.4th 1061, in which the defendant insurers, faced with an equitable contribution claim from a plaintiff insurer which had indemnified the common insured, sought to compel arbitration on the basis of arbitration clauses in the defendant insurers' insurance policies. The appellate court concluded arbitration could not be compelled, because a cause of action for equitable contribution is *not* based on the insurance policies, but arises in equity. (*Id.* at p. 1064.) The court rejected the defendant insurers' argument that they were simply trying to " 'stand in the shoes' " of the insured,

All plaintiffs in this case are apparently pursuing the cause of action for breach of the PSA's, although the legal basis on which each plaintiff is pursuing that cause of action is not entirely clear. The Modena-benefitted property plaintiffs, 15394 NM and NMS/JSM San Lorenzo, which are admittedly not signatories to the PSA's, seek to recover for breach of the Modena PSA, which required JSM Modena to transfer the Modena affordable housing property to signatory NMS Properties. Perhaps, as properties which would have been benefitted by the construction of the affordable housing on the Modena affordable housing property, the Modena-benefitted properties are proceeding on a third party beneficiary theory. What *is* clear, however, is that the Modena-benefitted property plaintiffs are seeking to recover against JSM Modena for JSM Modena's alleged breach of the Modena PSA; these plaintiffs cannot assert that they are entitled to recover according to the terms of that agreement, while simultaneously repudiating the arbitration clause contained therein.

█ Moreover, we believe that there is no rational basis to limit this conclusion to claims expressly based on the breach of the PSA's. The equitable estoppel doctrine extends to claims that are dependent upon or inextricably intertwined with the obligations imposed by the contract containing the arbitration clause. As with signatory plaintiffs, when nonsignatory plaintiffs are pursuing such claims, they should be bound by the arbitration clause in the contract which is integral to their claims.

Thus, resolution of the motion to compel arbitration should not involve, as plaintiffs would have it, counting up the number of nonsignatory plaintiffs and nonsignatory defendants, and denying the motion if there appear to be many of them. A nonsignatory plaintiff can be compelled to arbitrate a claim even against a nonsignatory defendant, when the claim is itself based on, or inextricably intertwined with, the contract containing the arbitration clause. We now turn to an analysis of plaintiffs' claims.

### 5. *The Record Is Insufficient to Enable Resolution of the Motion to Compel Arbitration*

We are thus required to analyze the causes of action alleged in the complaint, to determine whether the claims asserted by plaintiffs are dependent upon, or inextricably intertwined with, the obligations imposed by the

noting that a "common theme in [those] cases is that the party seeking relief was suing on the contract itself, not a statute or some other basis outside the contract." (*Id.* at p. 1071.) In contrast, however, when a nonsignatory of a contract is attempting to seek relief for breach of the contract itself, that nonsignatory *must* be doing so by means of either a third party beneficiary argument, or a legal theory which entitles that nonsignatory to "stand in the shoes" of a party to the agreement—either by virtue of a preexisting relationship, or as an assignee or successor in interest.

PSA's. As discussed above, plaintiffs pursue four types of claims: (1) claims for breach of the PSA's; (2) claims for breach of the Deed Restriction agreements; (3) claims that defendants used the wrongfully retained deposit amounts (from the PSA's) to develop their other projects; and (4) claims that defendants wrongfully encumbered the Tuscany and Modena properties. It is readily apparent that the first, third, and fourth category of claims are all dependent upon the PSA's. Obviously, claims for breach of the PSA's are dependent upon the PSA's. Claims for misuse of the wrongfully retained deposits are dependent upon the PSA's; the obligation to return the deposits was imposed by the amendment to the PSA's and nothing else. Claims for wrongfully encumbering the Tuscany and Modena properties similarly are dependent upon the PSA's; any obligation *not to* encumber the properties was imposed solely by the PSA's, which required the properties to be sold to NMS Properties. Thus, all of these claims, whether asserted by signatory or nonsignatory plaintiffs, and whether asserted against signatory or nonsignatory defendants, are based upon the obligations created by the PSA's and therefore subject to the arbitration clauses therein.

The problem lies with the second category of claims—those for breach of the Deed Restriction agreements. Preliminarily, as stated above (see fn. 12, *ante*), it is difficult for this court to determine the theory of liability asserted by plaintiffs against the benefitted-property defendants for breach of the Deed Restriction agreements. While the issue of whether plaintiffs can ultimately state a claim for relief against these defendants will be for the trial court or arbitrator to determine, some clear explication of plaintiffs' Deed Restriction-based causes of action against these defendants is necessary for court resolution of the motion to compel arbitration—as it must be determined whether the obligation purportedly breached is one inextricably intertwined with the obligations set forth in the PSA's. Moreover, given that, under the amendment to the PSA's, NMS Properties was to receive the affordable housing properties and construct the affordable housing projects there itself, we question the basis on which *any* plaintiffs can assert *any* cause of action against defendants for breaching the Deed Restriction agreements. The Deed Restriction agreements run with the land; NMS Properties would therefore be legally obligated to meet the requirements that such agreements imposed on the property owners.[21] Plaintiffs should not be permitted to avoid an arbitration obligation by manufacturing baseless causes of action purportedly based on a contract without an arbitration clause. In short, even if defendants were

---

[21] This *is* particularly true with respect to the Spoleto Deed Restriction agreement, which was not even executed until *after* the Spoleto PSA had been amended, providing that it would be NMS Properties that would develop the Spoleto affordable housing project.

initially obligated by the Deed Restriction agreements to construct the affordable housing projects on the three properties at issue, plaintiffs agreed (by amendments to contracts containing arbitration clauses) that *they* would take on the obligation to construct those projects. Under those circumstances, it is difficult to believe that plaintiffs can simultaneously sue defendants for breaching the Deed Restriction agreements by not constructing the projects, and harder still to believe that the issue should not be resolved by arbitration.

Beyond these substantial concerns, it is simply unclear as to whether the PSA's and the Deed Restriction agreements are inextricably intertwined. Certainly, a persuasive argument can be made that they are. The PSA's initially provided that Jones would construct "deed restricted" affordable housing projects on the properties; obtaining the Deed Restriction agreements could simply be seen as compliance with the obligations imposed by the PSA's. Even if the Deed Restriction agreements are seen as *confirming* defendants' intention to build those projects (and setting forth benefits that would be granted to other properties once the affordable housing projects were built), the initial construction obligation (and, certainly, any obligation flowing toward *plaintiffs*) was imposed by the PSA's.

An alternative argument also exists, at least with respect to the two Modena-benefitted property plaintiffs. These plaintiffs could conceivably assert that the Modena PSA was irrelevant. As owners of properties to be benefitted by the construction of affordable housing at Modena, by the terms of the Deed Restriction agreement, they could argue that JSM Construction's failure to construct that affordable housing harmed them—regardless of whether Jones had *also* promised Shekhter in the PSA that the affordable housing project would be built and/or sold to Shekhter.

Resolution of the issue of whether the Deed Restriction agreement causes of action are inextricably intertwined with the obligations under the PSA's would be dramatically aided by evidence regarding the economic benefits to be gained by Shekhter and the remaining plaintiffs by entering into the transactions at issue. With respect to the Tuscany and Spoleto projects, Shekhter had no interest in any of the properties to be benefitted by the construction of the affordable housing projects; Shekhter was simply to own (through NMS Properties) the affordable housing projects themselves. Was Shekhter intending to operate the Tuscany and Spoleto affordable housing projects at a profit? Or did he expect to gain some economic benefit from the fact that the affordable housing projects would benefit *other* properties, in

which he apparently had no interest?[22] If Shekhter intended to receive an economic benefit from the fact that other properties were benefitted from the operation of the affordable housing projects he agreed to operate, this would strongly suggest that the PSA's and Deed Restriction agreements were inextricably intertwined. If, to the contrary, Shekhter simply intended to benefit from operating the affordable housing projects themselves, the Deed Restriction agreements would arguably appear to be separate and apart from the PSA's.

While the analysis is somewhat different with respect to the Modena project, as Shekhter owned two of the Modena-benefitted properties, this simply raises further questions. Did Shekhter acquire ownership of the Modena-benefitted properties before or after the Deed Restriction agreements? Did he acquire ownership before or after the PSA's? Was his acquisition of the properties an element of the consideration for agreeing to operate the Modena affordable housing project, or completely independent of it? Indeed, was it consideration for agreeing to operate *all three* affordable housing projects, resulting in a conclusion that the three projects were interrelated, perhaps inextricably so?[23]

■ In conclusion, it is possible—perhaps even likely—that all causes of action in this case are based on, or inextricably intertwined with, the obligations imposed by the PSA's which contained the arbitration clauses. However, the record before us (and before the trial court) is insufficient to enable that determination. Thus, the trial court did not err in denying the motion to compel arbitration without prejudice. On remand, should defendants seek to renew such motion,[24] they must support the motion with exhibits and, if necessary, declarations, demonstrating that all causes of action— particularly those based on breach of the Deed Restriction agreements—are inextricably intertwined with the obligations imposed by the PSA's.[25]

---

[22] Was there, for example, a contemplated agreement whereby Shekhter would be compensated by the benefitted properties for his continued operation of the affordable housing projects which enable the benefitted properties to continue to operate as market-rate rentals?

[23] The Modena and Tuscany PSA's, at least, were simultaneously executed, as were the amendments to all three PSA's.

[24] A renewed motion would, obviously, be directed to the newly filed second amended complaint. At the hearing on the motion to compel arbitration, defendants suggested that they might renew their motion if they succeeded on demurrer with respect to some causes of action. Given our concerns regarding the breach of Deed Restriction agreement causes of action as alleged in the first amended complaint, such a demurrer may be appropriate.

[25] The issue of third parties must also be addressed. It appears from the first amended complaint that the Prudential defendants would have arguments similar, if not identical, to those of petitioners here. The Trust Deed Defendants, however, are not similarly situated. Should the trial court determine that petitioners are otherwise entitled to arbitration, the trial court should consider whether to stay the action against the Trust Deed Defendants pending

## DISPOSITION

The petition for a writ of mandate is denied. The matter is remanded for further proceedings consistent with this opinion. Each of the parties shall bear its own costs.

Kitching, J., and Aldrich, J., concurred.

---

completion of the arbitration pursuant to Code of Civil Procedure section 1281.2, subdivision (c). (*Laswell v. AG Seal Beach, LLC, supra,* 189 Cal.App.4th at p. 1405.)