Filed 7/19/22  Tanis Developments International v. Millennium Pictures CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| TANIS DEVELOPMENTS INTERNATIONAL, INC.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MILLENNIUM PICTURES INC.,<br><br>    Defendant and Appellant;<br><br>NEIL MARSHALL,<br><br>    Intervener and Respondent. | B314817<br><br>(Los Angeles County Super. Ct. No. 20STCV35794) |

APPEAL from an order of the Superior Court of Los Angeles County, Richard J. Burdge, Jr. Judge.  Reversed and remanded with directions.

Lavely & Singer, Martin D. Singer, Michael E. Weinsten and Allison S. Hart for Defendant and Appellant.

Fagelbaum & Heller, Jerold Fagelbaum and Philip Heller for Tanis Developments International, Inc. and Neil Marshall.

———————————

Tanis Developments International, Inc., a loan-out company that furnishes the writing and directing services of Neil Marshall, sued Millennium Pictures Inc. in mid-September 2020 for breach of a written contract (the Director's Agreement) between Millennium and Marshall. Although the Director's Agreement contained no arbitration clause, Millennium petitioned to compel Tanis and Marshall to arbitrate the dispute pursuant to the terms of a not-fully-signed letter agreement (the Duchess Agreement), which purported to terminate the Director's Agreement and provided for arbitration of any controversy or claim arising out of, or relating to, the Duchess Agreement. The parties to the Duchess Agreement were to be Tanis, Marshall, Charlotte Kirk, a cowriter of the Duchess screenplay, Millennium Pictures and Millennium Reservoir, Inc., an affiliate of Millennium Pictures.

After observing the Duchess Agreement had been signed only by the Millennium entities and its chief executive officer, Avi Lerner, the trial court denied the petition, ruling the Duchess Agreement did not constitute a valid agreement to arbitrate "as there was no meeting of the minds demonstrating an agreement to arbitrate." Because the evidence compelled a finding Tanis and Marshall impliedly agreed to arbitrate the contract claim, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Director's Agreement and the Duchess Agreement*

In 2017 Marshall was directing a motion picture titled Hellboy produced and to be distributed by Millennium. Contemporaneously Marshall and Kirk cowrote a screenplay, titled Duchess, with the intention that Marshall would direct the motion picture and Kirk would be cast as the female lead.

To resolve certain creative and business disputes concerning Hellboy, Marshall and Millennium entered into the Director's Agreement, effective as of February 22, 2019, and an option purchase agreement, pursuant to which Millennium acquired an option to develop and produce a motion picture based on the Duchess screenplay and agreed to engage Marshall as director and to approve Kirk as the female lead. The Director's Agreement also provided, subject to certain conditions, for payment to Marshall of a $500,000 "kill fee" in the event principal photography had not begun on the Duchess film by July 30, 2020. Marshall, in return, agreed not to seek to have his name removed from the screen credits as director of Hellboy.

The Director's Agreement included an amendment, also effective February 22, 2019, specifying Marshall's services under the Director's Agreement would be provided by Tanis and all payments for those services would be made by Millennium to Tanis. Exhibit A to the Director's Agreement was a literary option purchase agreement signed by Millennium Reservoir, Tanis and Kirk granting Millennium Reservoir the exclusive option to purchase the rights to the Duchess screenplay. Among other provisions the option agreement stated, "If pursuant to terms and conditions of the Director Agreement, this Agreement is deemed terminated and/or a reversion of all [rights] granted

hereunder to Owner [Tanis and Kirk] is provided for pursuant to the terms of such Director Agreement, then the parties to this Agreement acknowledge and agree that such termination and/or reversion shall be effective and applicable hereunder, notwithstanding that [Millennium Reservoir] and Kirk are not parties to the Director Agreement."

By late January 2020, following additional difficulties between the parties related, at least in part, to financing for the Duchess project, Marshall and Lerner discussed terminating the Director's Agreement; and their representatives began negotiating what ultimately became the Duchess Agreement. Pursuant to its terms (if effective), the Director's Agreement would be terminated, including the provision for payment of the $500,000 kill fee, and all rights to the Duchess screenplay would revert to Marshall and Kirk. The last iteration of this document, dated as of March 2, 2020, contained an arbitration clause in a lengthy "miscellaneous" paragraph, stating in part, "In the event of any controversy or claim arising out of or relating to this Agreement (including the scope or applicability of this Agreement to arbitrate) or the breach of any term hereof, the parties agree it will be resolved by confidential arbitration conducted in the County of Los Angeles, and administered by JAMS in accordance with its Comprehensive Rules and Procedures, including the Optional Appeal Procedure."

Paragraph 3 of the final document, "Kill Fee," stated, "For the sake of clarity, upon full execution of this Letter Agreement, Owner [defined as Marshall, Kirk and Tanis] hereby waives the Kill Fee as defined in the [Director's] Agreement." The document, which is in the form of a letter agreement from Marshall, Tanis and Kirk to Millennium, provided on its final

4

page, "Please indicate your understanding and acceptance of the foregoing by signing and returning this Letter Agreement."[1] Lerner and a representative for Millennium Pictures and Millennium Reservoir signed the document. The signature lines for Marshall, Kirk and Tanis remained blank.

 2. *Tanis's Complaint and the Petition To Compel Arbitration*

Tanis filed its complaint for breach of written contract on September 18, 2020, naming as defendants Millennium and 10 Does. The complaint alleged Millennium had breached the Director's Agreement and Tanis was entitled to the $500,000 kill fee because Millennium had not commenced principal photography of the Duchess motion picture by the deadline of July 30, 2020.[2]

On April 22, 2021 Millennium petitioned to compel arbitration and to stay or dismiss the lawsuit, contending,

---

[1] The document also provided that no modification, alteration or amendment would be valid or binding "unless in writing and signed by both of the parties hereto."

[2] Several months before Tanis filed its complaint, Lerner and three other entertainment industry executives had initiated an arbitration proceeding against Kirk, Marshall and other individuals, primarily asserting claims for breach of contract, interference with contract and civil extortion relating to the potential disclosure of information in an August 2017 confidential settlement agreement that resolved (with no admission of wrongdoing) Kirk's claims of sexual harassment, infliction of emotional distress and defamation. (See *Kirk v. Ratner* (2022) 74 Cal.App.5th 1052, 1056-1057.) The demand for arbitration also included a claim by Lerner against Marshall and Kirk for violating the Duchess Agreement.

5

"[a]lthough Marshall and Tanis did not physically sign the Duchess Agreement, their agreement to all the terms, including the material terms, is confirmed in written emails exchanged between the attorney for Marshall and Tanis and the attorney for Millennium."

### 3. *The Parties' Evidence Regarding Negotiation of the Duchess Agreement*

According to the evidence submitted by Millennium in support of its petition to compel arbitration, because of difficulties in casting actors who were capable of generating financing for a motion picture based on the Duchess screenplay (a condition for Millennium to move forward with production), Marshall informed Lerner in January 2020 he wanted to terminate the Director's Agreement and have the right to the screenplay revert to him.[3] Millennium agreed.

In late January and February 2020 Lonnie Ramati, Millennium's executive vice president of business and legal affairs, began negotiations with Phil Rymer, a British entertainment attorney representing Marshall. They ultimately agreed on basic terms, including termination of the Director's Agreement and with it Millennium's obligation to pay Marshall a kill fee if principal photography had not been commenced on the project by the specified date; assignment of Millennium's option to purchase the Duchess screenplay to Marshall; and agreement

---

[3] In his declaration in support of Millennium's petition, which identified the casting issue as the trigger for discussions to terminate the Director's Agreement, Lerner stated that, by this point, Millennium had already spent thousands of dollars in development costs and devoted a considerable amount of employee time on the project.

6

that Lerner would receive a producer credit and 5 percent of net profits if a motion picture based on the Duchess screenplay was ever produced. According to Ramati, "Once Mr. Rymer confirmed his client's agreement to the foregoing terms, he informed me that Mr. Marshall would be turning the matter over to his entertainment attorney in the U.S."

On February 27, 2020 Ramati sent Marshall an email confirming the basic terms of the agreement Ramati had negotiated with Rymer and requested that Marshall have his attorneys in the United States draft the documents. Marshall responded to Ramati, "My lawyers should be reaching out to you in due course," and said he was now being represented by Duncan Hedges and Adam Kaller. Marshall forwarded Ramati's email to Hedges and Kaller on the day it was received. Hedges testified at his deposition he spoke with Marshall either before or immediately after Marshall forwarded the Ramati email to him and he understood his role was to draft a document and negotiate with Ramati. Specifically, Hedges stated, "I was authorized to draft the agreement—proposed agreement, and negotiate it with Lonnie [Ramati]. That was the authorization I was given."

Hedges sent an initial draft of the Duchess Agreement to Ramati on March 5, 2020. Hedges's transmittal email concluded with the phrase, "Reserving rights." Hedges could not remember whether he had sent the draft to Marshall before providing it to Ramati or just spoke to Marshall about it over the telephone. Hedges acknowledged he had Marshall's approval to send the draft.

Ramati responded promptly in two emails within minutes of each other with comments and proposed changes including the request the agreement contain an arbitration provision: "Add

7

JAMs provision." Ramati also asked that the agreement include an express statement that no kill fee was due. Hedges forwarded this exchange to Marshall, and Marshall responded to Hedges's email. Although the substance of the communications between Hedges and Marshall was redacted as privileged, at his deposition Hedges testified, if a client told him not to include a term in an agreement, he would not put that term in a draft.

On March 9, 2020 Ramati emailed Hedges asking for a response and indicating, "We'd like to finish this today please." Hedges replied, "I will get you back a revised today" and later that day sent Ramati a redlined revised draft and clean copy of the Duchess Agreement. The new draft incorporated, with minor modifications, Ramati's revisions, including a JAMS arbitration provision. A short while later Ramati requested a further revision concerning the scope of services Lerner would provide and expressed the "[h]ope to finish this ASAP."

Hedges made the requested changes, returned the agreement to Ramati, stating, "If this is acceptable, please have it signed and returned to us." Hedges's email once again included "Reserving rights." Ramati, in turn, replied, "I am fine with this. Can you get it signed and sent back to us? Then we can countersign. Thank you." The following morning, March 10, 2020, Hedges emailed back, "Given the fact that we are waiving a kill fee as part of this agreement, we would like it signed on your side first. Thanks." On April 1, 2020 Ramati returned the signed agreement with the request, "Please have it countersigned as promised below," referring to Hedges's attached earlier email. In fact, the document returned on April 1, 2020 had only Lerner's

8

signature and none from a representative of Millennium.[4] According to Ramati, once Lerner had signed the agreement, Millennium refrained from taking any further steps to finance or produce a motion picture based on the Duchess screenplay.

Hedges testified at his deposition that he did not believe he had any communications with Ramati after receiving the April 1, 2020 email. He also testified he did not believe he forwarded a copy of the partially signed agreement to Marshall, although he spoke to Marshall about it.

On May 7, 2020 Ramati emailed Hedges explaining it was unclear from a review of the files whether the version of the Duchess Agreement he had sent previously had all necessary signatures from the Millennium/Lerner parties or only Lerner's signature. "In an abundance of caution," Ramati sent a fully signed (that is, by Lerner and Millennium representatives) version. Hedges testified he had no communications with Ramati after receiving the May 7, 2020 email.

In support of their opposition to the motion to compel arbitration, Tanis and Marshall submitted Marshall's declaration that discussions about terminating the Director's Agreement began because, in Marshall's view, Millennium was not satisfactorily performing its responsibilities under the agreement. Although Marshall agreed he and Lerner discussed

---

[4]     The initial draft of the Duchess Agreement prepared by Hedges included exhibit A, Certificate of Ownership of Results and Proceeds, by which Lerner confirmed all results of his services in connection with the Duchess project were "'work made for hire'" for Tanis, Marshall and Kirk. This two-page document remained unchanged throughout the March 5 through 9 negotiation and redrafting process and was signed by Lerner and returned to Hedges by Ramati on April 1, 2020.

9

the basic concept of waiving the kill fee in exchange for an early reversion of rights to the Duchess screenplay, he declared they did not discuss and did not agree to the numerous other terms and conditions negotiated by Ramati and Hedges, specifically any agreement to arbitrate disputes between the parties. In addition, Marshall asserted Hedges "had *no authority* to bind me to any oral or written agreement." In the declaration Marshall also noted the Director's Agreement provided it could only be modified by written agreement signed by all parties.

Kirk submitted her declaration stating, after reviewing the draft of the proposed Duchess Agreement (prepared by lawyers for Tanis, Marshall and Millennium, not her lawyer), "I did not accept and refused to sign. . . . When I first saw the proposed draft, I was unwilling to among other things waive the 'Kill Fee' or consent to binding arbitration in the event of a future dispute. I so notified my co-writer and co-owner Neil Marshall." Kirk also declared, "I rendered no performance under the *proposed* 'Duchess Agreement' and received no benefit."

Tanis and Marshall also emphasized Hedges's deposition testimony that he did not have the authority to bind Tanis or Marshall to an agreement and did not even represent Kirk.

4. *Comments by Marshall's Attorneys Indicating Marshall's Acceptance of the Duchess Agreement*

In support of its argument that Marshall had effectively accepted the terms of the Duchess Agreement even though he had not signed the document, Millennium submitted a heavily redacted April 22, 2020 demand letter from attorney John Cowan to Millennium's counsel Martin Singer regarding, "My Client: Neil Marshall." In the legible portions of the letter, Cowan, after referring to difficulties with financing the Duchess project,

stated, "Eventually Mr. Lerner then stepped back from the project so far that Mr. Marshall had no alternative but to take the project back from Millennium and produce it himself."

Millennium also submitted redacted copies of Marshall's June 26, 2020 filings in opposition to a request for a preliminary injunction in a related arbitration proceeding. In one of those filings Marshall's counsel stated, "On March 2, 2020, the parties entered into a written agreement whereby the parties agreed to rescind the Director's Memorandum Agreement, reverting ownership of *Duchess* back to Marshall (the 'Duchess Agreement')." In a second filing Marshall's arbitration counsel argued the arbitrator lacked jurisdiction over Marshall because he had only "agreed to arbitrate disputes *related to the Duchess Agreement*" (italics in original).

In response to this evidence, Tanis and Marshall asserted Cowan's letter, contrary to Millennium's argument, did not admit the Duchess Agreement had been consummated and noted Cowan was not involved in the negotiations of the agreement and not qualified to characterize their status.[5] Similarly, they argued the arbitration filings were prepared by newly retained counsel who had relied on a declaration filed in the proceedings by Ramati that incorrectly stated the Duchess Agreement had been "entered into" by all parties.

---

[5] In his declaration in opposition to the petition to compel arbitration, Marshall also noted Cowan's statement on April 22, 2020 was made before Millennium (but not Lerner) had actually signed the Duchess Agreement.

5. *The Ruling Denying the Petition To Compel Arbitration*

After receiving the parties' initial briefs and evidentiary submissions, the trial court issued a tentative ruling to deny Millennium's petition. However, at the hearing on May 12, 2021 the court granted Millennium's request to depose Hedges regarding his authority to enter into the agreement on behalf of his clients.

Following that deposition and supplemental briefing, the court at the continued hearing on August 12, 2021 adopted its May 2021 tentative ruling as the final order and denied the petition, explaining, "I've seen your supplemental papers, but I didn't see anything in that deposition testimony or in your papers that shows that discovery showed [Hedges] had any authority to enter into the agreement."

The court ruled the Duchess Agreement "does not constitute a valid agreement to arbitrate, as there was no meeting of the minds demonstrating an agreement to arbitrate." After quoting *Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 358—which held, when a proposed written contract expressly provides it would become operative only when signed by the parties, "the failure to sign the agreement means no binding contract was created"—the court found, "The Duchess Agreement on its face is signed by only Lerner and MPI [Millennium], and states that parties demonstrate their agreement to the Duchess Agreement's terms by signing the Duchess Agreement. Thus, the principle articulated in Banner applies, as the Duchess Agreement is clear on its face that it would become operative if signed by the parties. Additionally, Marshall and Kirk have submitted admissible

12

evidence demonstrating that they did not agree to the Duchess Agreement."

Citing *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1240—which held a plaintiff could be equitably estopped from repudiating the arbitration clause in a contract when suing to recover for breach of that contract, even though not a signatory, on the basis of its relationship to one of the parties that signed the agreement—the court rejected Millennium's argument Tanis and Marshall were estopped from claiming the Duchess Agreement was not binding and enforceable. The court explained, unlike the situations described in *JSM Tuscany* as justifying application of equitable estoppel, Millennium did not have a preexisting relationship to any parties to the Duchess Agreement, "as the Duchess Agreement was signed by only Lerner and MPI [Millennium]."

Millennium filed a timely notice of appeal.

## DISCUSSION

1. *Governing Law and Standard of Review*

Code of Civil Procedure section 1281.2 requires the superior court to order arbitration of a controversy "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate such controversy . . . if it determines that an agreement to arbitrate the controversy exists." As the language of this section makes plain, the threshold question presented by every petition to compel arbitration is whether an agreement to arbitrate exists. (*American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. 228 [it is an "overarching principle that arbitration is a matter of contract"]; *Pinnacle Museum Tower Assn. v. Pinnacle*

13

*Market Development  (US), LLC* (2012) 55 Cal.4th 223, 236
(*Pinnacle*) [""a party cannot be required to submit to arbitration
any dispute which he [or she] has not agreed so to submit""];
*Gordon v. Atria Management Co., LLC* (2021) 70 Cal.App.5th
1020, 1026 ["California has a strong public policy in favor of
arbitration, but "'a party cannot be compelled to arbitrate a
dispute that [he or she] has not agreed to resolve by
arbitration""].)

"In California, '[g]eneral principles of contract law
determine whether the parties have entered a binding agreement
to arbitrate.' [Citations.]  Generally, an arbitration agreement
must be memorialized in writing.  [Citation.]  A party's
acceptance of an agreement to arbitrate may be express, as where
a party signs the agreement.  A signed agreement is not
necessary, however, and a party's acceptance may be implied in
fact [citation] or be effectuated by delegated consent [citation].
An arbitration clause within a contract may be binding on a party
even if the party never actually read the clause."  (*Pinnacle*,
*supra*, 55 Cal.4th at p. 236; accord, *Mendoza v. Trans Valley
Transport* (2022) 75 Cal.App.5th 748, 777; see generally Civ.
Code, §§ 1584 ["[p]erformance of the conditions of a proposal, or
the acceptance of the consideration offered with a proposal, is an
acceptance of the proposal"], 1589 ["[a] voluntary acceptance of
the benefit of a transaction is equivalent to a consent to all the
obligations arising from it, so far as the facts are known, or ought
to be known, to the person accepting"].)

The party seeking to compel arbitration bears the burden of
proving by a preponderance of the evidence an agreement to
arbitrate a dispute exists.  (*Pinnacle, supra*, 55 Cal.4th at p. 236;
*Rosenthal v. Great Western Fin. Securities Corp.* (1996)

14 Cal.4th 394, 413; *Nixon v. AmeriHome Mortgage Co., LLC* (2021) 67 Cal.App.5th 934, 946.)  To carry this burden of persuasion the moving party must first produce "prima facie evidence of a written agreement to arbitrate the controversy." (*Rosenthal,* at p. 413; accord, *Gamboa v. Northeast Community Clinic* (2021) 72 Cal.App.5th 158, 165 (*Gamboa*).)  "If the moving party meets its initial prima facie burden and the opposing party disputes the agreement, then . . . the opposing party bears the burden of producing evidence to challenge the authenticity of the agreement." (*Gamboa,* at p. 165; accord, *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972; *Rosenthal*, at p. 413.)  If the opposing party produces such evidence, then "the moving party must establish with admissible evidence a valid arbitration agreement between the parties."  (*Gamboa,* at p. 165.) "Despite the shifting burden of production, '[t]he burden of proving the agreement by a preponderance of the evidence remains with the moving party.'"  (*Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1120] (*Trinity*); see *Rosenthal*, at p. 413.)

Absent conflicting evidence, we review de novo the trial court's interpretation of an arbitration agreement.  (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 413; *Trinity, supra,* 78 Cal.App.5th at p. 1120; *Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1277.)  Where the trial court's ruling is based on a finding of fact, we review the decision for substantial evidence.  (*Gamboa, supra,* 72 Cal.App.5th at p. 166; *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1066.)  Under this deferential standard, "'[A]ll factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment.'"

15

(*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60; accord, *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571; see *Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 818 ["We must not review the evidence to determine whether substantial evidence supports the losing party's version of the evidence. Instead, we must determine if there is any substantial evidence, contradicted or uncontradicted, to support the trial court's findings"].)

However, "[w]hen, as here, the court's order denying a motion to compel arbitration is based on the court's finding that petitioner failed to carry its burden of proof, the question for the reviewing court is whether that finding was erroneous as a matter of law." (*Fabian v. Renovate America, Inc.*, *supra*, 42 Cal.App.5th at p. 1066; see also *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 ["'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law'"].) "'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Dreyer's Grand Ice Cream, Inc.*, at p. 838; accord, *Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 333; see *In re R.V.* (2015) 61 Cal.4th 181, 201 [where a party fails to meet its burden on an issue in the trial court, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the [trial] court could not reasonably reject it"].)

16

### 2. *The Trial Court Erred in Denying the Petition To Compel Arbitration*

The propriety of the trial court's order denying Millennium's petition to compel arbitration raises three distinct, albeit related, questions: Did the Duchess Agreement (or at least its arbitration provision) require the signatures of the parties to become operative? If not, did the evidence require the trial court to find Marshall's implied-in-fact agreement? Even if Marshall's agreement should be inferred, what, if anything, is the significance of Kirk's lack of agreement, either express or implied? The answer to the first question is no; to the second, yes; and to the third, none under the circumstances of this case.

#### a. *The signature of all parties was not required to form a binding agreement to arbitrate*

Whether the arbitration provision in the Duchess Agreement would become operative only when the document was signed by all parties is a question of contract interpretation that, in the absence of conflicting extrinsic evidence, we review de novo. (See *Trinity, supra,* 78 Cal.App.5th at p. 1120; *Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978.) Here, there can be no question the language of the document (and of Ramati's and Hedges's emails concerning the order of signing) reflects an expectation all parties would sign the agreement. Thus, as Tanis and Marshall emphasize, the final page provided, "Please indicate your understanding and acceptance of the foregoing by signing and returning this Letter Agreement." The anticipation of a fully signed agreement, however, does not necessarily mean acceptance of its terms cannot be implied by the nonsignatories' conduct. (See *Douglass v. Serenivision, Inc.* (2018) 20 Cal.App.5th 376, 387 ["parties may enter into an

implied in fact agreement to arbitrate through their conduct (which may additionally be deemed to estop them from denying such an agreement)"]; *Craig v. Brown & Root* (2000) 84 Cal.App.4th 416, 420 [a party's acceptance of an agreement to arbitrate may be express or implied-in-fact].)

As the court of appeal explained in *Banner Entertainment, Inc. v. Superior Court*, *supra*, 62 Cal.App.4th 348, the basis for the trial court's determination on this point, while general contract law recognizes both express and implied acceptance of proposed contract terms, there is no binding agreement when it is clear "that the proposed written contract would become operative *only* when signed by the parties." (*Id*. at p. 358.) The *Banner* court held the language in the document before it demonstrated the parties had unmistakably conditioned the binding effect of their agreement on it being signed. That *Banner* language, however, differs significantly from the language in the Duchess Agreement.

The unsigned agreement in *Banner* provided, "The parties hereto anticipate entering into a more formal agreement incorporating the above terms, together with such other provisions as are customary for arrangements of this kind. Until such time, if ever, as such more formal agreement [is] concluded, this agreement *when signed by the parties hereto* will constitute a legal and binding obligation of the parties. [¶] Please acknowledge your approval of the foregoing terms by signing a copy of this letter in the space indicated below." (*Banner Entertainment, Inc. v. Superior Court, supra*, 62 Cal.App.4th at p. 354.) Thus, the parties' signatures in *Banner* did not merely indicate understanding and acceptance of the terms of the

18

agreement, as here, but were expressly required for the agreement to become binding.

Language similar to that in *Banner* does appear in two places in the Duchess Agreement.  In paragraph 3 regarding the kill fee, added to the draft by Hedges in response to one of Ramati's March 5, 2020 notes, states, "For the sake of clarity, upon full execution of this Letter Agreement, Owner hereby waives the Kill Fee as defined in the Agreement."[6]  And miscellaneous paragraph 12, in addition to the arbitration clause and a provision that California law would govern interpretation of the agreement, provided no modifications or amendments to the Duchess Agreement would be "valid or binding unless in writing and signed by both parties hereto."  The absence of similar language expressly conditioning the binding effect of the arbitration provision or the agreement as a whole "upon full execution" persuades us the absence of signatures by Tanis and Marshall is not dispositive.  (See *Mendoza v. Trans Valley Transport, supra,* 75 Cal.App.5th at p. 777 ["'A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement.  A signed agreement is not necessary, however, and a party's acceptance may be implied in fact'"]; cf. *Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 311-312 ["'[l]anguage referring to a

---

[6]     The Director's Agreement, which provided for the kill fee if other conditions had been met and principal photography had not commenced by July 30, 2020, specified it could not be modified "except by written document executed by the party to be charged."  Whether an implied agreement to written terms modifying or terminating the Director's Agreement would be effective is not an issue in this appeal.

19

particular mode of acceptance is often intended and understood as suggestion rather than limitation; the suggested mode is then authorized, but other modes are not precluded," quoting Rest.2d Contracts, § 30, com. b, p. 85].)

> b. *The evidence compelled a finding Marshall and Tanis impliedly agreed to the terms of the Duchess Agreement*

To reiterate the key events, in late January 2020 Marshall and Lerner began discussions of an early termination of the Director's Agreement. Ramati and Rymer then agreed to the basic terms, which remained unchanged throughout the discussions—the Director's Agreement would be voided, the option to the Duchess screenplay would be returned to Marshall and Lerner would receive a producer credit and 5 percent of net profits on a motion picture if one was made. Rymer confirmed Marshall's agreement to the terms and told Ramati that Marshall was turning the matter over to his entertainment lawyers in the United States. Ramati then sent an email with those basic terms directly to Marshall, who responded that Marshall's lawyers would be reaching out to Ramati.

With Marshall's approval, an initial iteration of the agreement was sent by Hedges to Ramati on March 5, 2020 in the form of a letter agreement dated March 2, 2020. Ramati responded with comments including a request for an arbitration provision. Hedges forwarded Ramati's comments to Marshall, and Marshall and Hedges communicated about the agreement before Hedges, on March 9, 2020, sent Ramati a revised version that included the arbitration provision. After one further change requested by Ramati, Hedges sent the document back to Ramati, stating, "If this is acceptable, please have it signed and returned to us." Ramati replied the current version was fine, but asked

20

that Hedges have it signed first. The following day, March 10, 2020, Hedges replied, "Given the fact that we are waiving a kill fee as part of this agreement, we would like it signed on your side first." Unlike several of his prior email communications with Ramati, Hedges's March 10, 2020 email did not include "Reserving rights."

On April 1, 2020 Ramati sent Hedges the Duchess Agreement signed by Lerner and on May 7, 2020 another copy of the agreement signed by Lerner and Millennium. On April 1, 2020 Ramati also sent the signed exhibit to the Duchess Agreement confirming Lerner's work on the project was owned by Marshall, Kirk and Tanis. Thereafter, Millennium refrained from taking any further steps to finance or produce the motion picture.

At no time between April 1, 2020 and the filing of the complaint in this lawsuit in mid-September 2020 did Hedges or anyone else on behalf of Marshall or Tanis advise Millennium the Duchess Agreement had not been accepted. To the contrary, lawyers for Marshall in communications with counsel for Millennium and in filings in arbitration proceedings involving Lerner made statements unquestionably indicating their understanding the Duchess Agreement had been consummated and, as a result, Marshall had taken back all rights to the Duchess screenplay and the related film project.

This chronology compels the conclusion that Marshall, and through him Tanis, impliedly agreed to the terms of the Duchess Agreement, including its arbitration provision. To be sure, in his declaration Marshall avers he did not agree and, for that reason, did not sign the document. But that lack of agreement was never communicated prior to the filing of the lawsuit—certainly not on

21

March 9 and 10, 2020 when Hedges sent signature copies of the agreement to Ramati. Evidence of Marshall's undisclosed subjective intent is irrelevant to determining the existence of mutual assent or the meaning of contractual language. (See *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579-580 ["uncommunicated subjective intent is irrelevant" to mutual assent, which is determined from the reasonable meaning of the parties' words and actions]; *Martinez v. BaronHR, Inc.* (2020) 51 Cal.App.5th 962, 970 ["[t]he law is well settled that unexpressed subjective intentions are irrelevant to the issue of mutuality"]; *Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 788 [""[m]utual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, not their unexpressed intentions or understandings""]; *Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 173 [same]; see also *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3 [evidence of subjective intent "was not *competent* extrinsic evidence, because evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language"].)

Similarly, although Marshall and Hedges asserted Hedges was authorized only to negotiate on Marshall's behalf, not to bind him to any agreement, Hedges conceded at his deposition he would not put a term in a draft if a client had told him not to include the term. And the evidence established that Hedges provided Marshall with Ramati's request for the arbitration provision before sending Ramati the revised draft that contained it, demonstrating Marshall's acquiescence in the inclusion of such a term in the agreement.

Any doubt as to this conclusion is resolved by application of the doctrine of equitable estoppel, which the trial court rejected based on an unduly limited understanding of its scope: "An estoppel may arise although there was no designed fraud on the part of the person sought to be estopped. To create an equitable estoppel, it is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss." (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384 [cleaned up]; see Evid. Code, § 623 ["[w]henever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it"].)[7]

Marshall, through his counsel Hedges, unquestionably led Millennium reasonably to believe he had agreed to all the terms of the Duchess Agreement as set forth in the second iteration of the document sent by Hedges to Ramati on March 9, 2020. Why would Hedges ask Ramati to sign the agreement if Marshall were not in accord? Indeed, why else, the following day, would Hedges insist that "we"—a plural connoting not only Hedges but also his

---

[7] "'There are four basic elements of equitable estoppel: (1) The party to be estopped must have known the facts; (2) the party to be estopped must have intended that its conduct would be acted upon, or it must have acted so as to have given the party asserting estoppel the right to believe that it was so intended; (3) the party asserting estoppel must have been ignorant of the true state of facts; and (4) the party asserting estoppel must have relied on the conduct to its injury.'" (*Komorsky v. Farmers Ins. Exchange* (2019) 33 Cal.App.5th 960, 972.)

client—wanted Millennium to sign the agreement "first"—unmistakably implying a "second" signature would be forthcoming, not that the terms of the agreement were still under review?

Lerner and Millennium provided evidence they relied on that state of affairs to cease further action with respect to financing and producing a film based on the Duchess screenplay, and Lerner executed the certificate confirming Marshall, Kirk and Tanis's ownership of Lerner's work product in connection with the project. Marshall is now estopped to assert he never agreed to be bound. (See *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 486 [When the doctrine of equitable estoppel is successfully invoked, "the court in effect closes its ears to a point—a fact, argument, claim, or defense—on the ground that to permit its assertion would be intolerably unfair. It is commonly said that the party to be estopped, having conducted himself in manner X, will 'not be heard' to assert Y" (fn. omitted)].)

### c. *Kirk's consent was unnecessary for the Duchess Agreement to be binding as to Tanis and Marshall*

Kirk did not sign the Duchess Agreement. According to her declaration, she was not represented by Hedges and did not participate in discussions leading to preparation of the final form of the document, which was sent by Hedges to Ramati on March 9, 2020. Nor, apparently, was she represented by the attorneys who on Marshall's behalf made statements in April and June 2020 referring to a completed agreement.[8] Accordingly,

---

[8] In his declaration in support of the motion to compel arbitration, Singer, the recipient of Cowan's April 22, 2020 demand letter, stated Cowan was at the time representing both

Tanis and Marshall assert, even if they could be found to have impliedly agreed to the arbitration provision in the Duchess Agreement, without Kirk's agreement (express or implied) there could be no binding agreement as to any of them.

This argument, made in the trial court but not addressed in the court's ruling, does not accurately reflect California's more nuanced law on this issue. As the court held in *Angell v. Rowlands* (1978) 85 Cal.App.3d 536, 542, "[A] contract is invalid if not signed by all parties purportedly bound *only when it is shown*, either by parol or express condition, that the contract was not intended to be complete until all parties had signed. Conversely, in the absence of a showing that the contract is not intended to be complete until signed by all parties, the parties who did sign will be bound." This legal principle was more recently confirmed by our colleagues in Division Eight of this court in *Fagelbaum & Heller LLP v. Smylie* (2009) 174 Cal.App.4th 1351, who agreed with the law firm it was entitled to compel a former client to arbitrate a contractual dispute based on the arbitration provision in a retainer agreement that he had signed even though three other represented parties had not signed it. The court concluded, "Smylie did not meet his burden to prove 'that the signatures of all parties were contemplated as being a condition precedent to the validity of the contract [citation].' [Citation.] His signature individually bound him to the agreement and to the arbitration clause within it." (*Id*. at p. 1365.)

Nothing in the Duchess Agreement indicated it was not intended to be complete unless Kirk signed or otherwise agreed to

Marshall and Kirk. The unredacted portions of the letter, however, referred only to Marshall as Cowan's client.

be bound be it. Nor was there any reason it should. The purpose of the Duchess Agreement was to terminate the Director's Agreement. Kirk was not a party to that agreement and had no rights or responsibilities under it, including to the kill fee, which, if due, would be paid to Tanis for the benefit of Marshall. Moreover, although Kirk was a party to the literary option agreement by which Millennium (through its affiliate, Millennium Reservoir) acquired rights to the Duchess screenplay, which Kirk cowrote, the option agreement expressly provided it could be terminated and the rights granted would revert to Kirk and Tanis by agreement of the parties to the Director's Agreement without Kirk's approval. That is exactly what happened by virtue of Marshall's implied agreement to the Duchess Agreement. That the arbitration provision (or the release of claims) in the Duchess Agreement may not be binding on Kirk does not affect the enforceability of the arbitration provision with respect to Tanis and Marshall.

## DISPOSITION

The order denying the petition to compel arbitration is reversed. The cause is remanded with directions to the trial court to issue a new order granting the petition to compel arbitration and staying further proceedings in the trial court pursuant to Code of Civil Procedure section 1281.4. Millennium is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.