Filed 3/25/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ARMANDO BALLESTEROS, <br><br> Plaintiff and Respondent, <br> v. <br><br> FORD MOTOR COMPANY, <br><br> Defendant and Appellant. | A172271 <br><br> (San Bernardino County <br> Super. Ct. No. <br> CIVSB2208834) |

Plaintiff and respondent Armando Ballesteros entered into a retail installment contract with Fairview Ford Sales, Inc. (Fairview), a car dealership, when purchasing a new car. Ballesteros and Fairview were the only parties and signatories to that contract. After Ballesteros discovered defects in the car that were not repaired, he sued Fairview, along with defendant and appellant Ford Motor Company (Ford), the car manufacturer, under the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.; Song-Beverly Act). Both defendants moved to compel Ballesteros to arbitrate his claims pursuant to a provision in the contract signed by Ballesteros and Fairview, which covered disputes between Ballesteros and Fairview only. (Code Civ. Proc., § 1281.2.) The trial court compelled arbitration as to the signatory, Fairview, but denied the motion as to the nonsignatory, Ford.

On appeal, Ford contends that even though it was not a party or signatory to the contract containing the arbitration provision, Ballesteros is estopped from arguing that Ford cannot compel arbitration. According to

1

Ford, Ballesteros's claims against Ford are intertwined with the contract because they seek rescission and reimbursement of the purchase price and because they are based on warranties that Ford contends arose from the contract.

We will affirm the order. We reject Ford's arguments that Ballesteros's claims are so intertwined with the contract that he should be forced to arbitrate his claims against Ford. Instead, we conclude that Ballesteros's statutory claims against Ford are based on warranties that fall outside the four corners of Ballesteros's contract with Fairview. In so concluding, we join the many courts of appeal that have disagreed with *Felisilda v. FCA US LLC* (2020) 53 Cal.App.5th 486 (*Felisilda*). (See, e.g., *Ford Motor Warranty Cases* (2023) 89 Cal.App.5th 1324, review granted July 19, 2023, S279969 (*Ford Warranty*); *Davis v. Nissan North America, Inc.* (2024) 100 Cal.App.5th 825, review granted May 29, 2024, S284697 (*Davis*); *Yeh v. Superior Court* (2023) 95 Cal.App.5th 264, 269–279, review granted Nov. 15, 2023, S282228 (*Yeh*).[1] We add that our conclusion is supported – if not necessitated – by important, broader equitable concerns. Under well-established California contract law, arbitration cannot be imposed on a signatory plaintiff's claims against a nonsignatory without a clear showing by the nonsignatory that inequity would otherwise result. Ford does not come close to making that showing here.

[1]    Our Supreme Court accepted review in *Ford Warranty* to resolve the following issue: "Do manufacturers'[s] express or implied warranties that accompany a vehicle at the time of sale constitute obligations arising from the sale contract, permitting manufacturers to enforce an arbitration agreement in the contract pursuant to equitable estoppel?" It granted review in subsequent cases and held them pending its resolution of *Ford Warranty*.

# I.  FACTS AND PROCEDURAL HISTORY

## A.  Ballesteros's Contract with Fairview

Ballesteros purchased a new 2017 Ford Explorer Sport (Explorer) at Fairview in August 2018.  He signed a pre-printed form entitled "RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION)" (Contract).  Under the terms of the Contract, he agreed to buy the Explorer on credit rather than for cash.  In doing so, he agreed to pay Fairview the amount he was financing plus a finance charge.

The Contract identified the Explorer that Ballesteros purchased.  It set forth federal truth-in-lending disclosures, including the amount financed, the annual percentage rate, and the total sale price.  It noted that Ballesteros was trading-in a car to reduce the amount he owed for the Explorer.  It identified optional service contracts, without detailing the terms of those agreements.  The Contract was only between Ballesteros, identified as the "Buyer" and "You," and Fairview, identified as the "Seller-Creditor," "we," and "us."  There were no other parties or signatories to the Contract.

The first page of the Contract included an "Agreement to Arbitrate," which stated that "you [Ballesteros] or we [Fairview] may elect to resolve any dispute" by arbitration rather than court action pursuant to the "Arbitration Provision" that appeared on page five of the Contract.  That Provision stated: "**ARBITRATION PROVISION  [¶]  PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS . . . EITHER *YOU*** [Ballesteros] ***OR WE*** [Fairview] **MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL . . . .**  Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), *between you*

3

*[Ballesteros] and us [Fairview] or our employees, agents, successors or assigns*, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at *your [Ballesteros's] or our [Fairview's]* election, be resolved by neutral, binding arbitration and not by a court action." (Bolding in original; italics added.)

The Contract did not identify any applicable warranties. To the contrary, it contained a provision entitled "**WARRANTIES SELLER DISCLAIMS**," which stated: "**If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose**. [¶] This provision *does not affect* any warranties covering the vehicle that the vehicle *manufacturer* may provide. If the Seller has sold you a certified used vehicle, the warranty of merchantability is not disclaimed." (Bolding in original; italics added.)

B. <u>Ballesteros's Lawsuit</u>

Ballesteros sued Fairview, as the retailer, and Ford, as the distributor and manufacturer of his Explorer. He alleged that the Explorer was delivered with serious defects and "nonconformities" and that it later developed other serious defects and "nonconformities to warranty." Among other things, the Explorer did not start, had engine problems, and contained a defective infotainment system. Ballesteros took the car to an authorized facility for repairs, but the defects were not fixed.

4

Ballesteros's complaint did not allege a cause of action for breach of the Contract. Nor did it allege that any warranty arose out of the Contract. Instead, Ballesteros asserted three causes of action under the Song-Beverly Act – also known as the Lemon Law – which includes remedies for breach of warranties accompanying the sale of a motor vehicle.

The first cause of action, alleged against both Ford and Fairview, was based on the breach of an express warranty under the Song-Beverly Act. As to Ford, Ballesteros alleged that "[e]xpress warranties accompanied the sale" of the Explorer, by which Ford understood it would have to preserve or maintain the Explorer's utility and performance. He then alleged that Ford breached "its obligations *under the [Song-Beverly] Act.*" (Italics added.) "Under [that] Act," Ballesteros sought reimbursement of the price paid (less certain amounts) and other relief.

The second cause of action, also alleged against Ford and Fairview, was based on the breach of an implied warranty under the Song-Beverly Act. It alleged that "[Ford] and [Fairview] had reason to know the purpose of the [Explorer] at the time of sale," that the sale "was accompanied by implied warranties provided for under the law," and that "the sale of the [Explorer] was accompanied by an implied warranty that [it] was merchantable[.]" Ballesteros alleged that he was entitled to "replacement or reimbursement" and "rescission" under the Song-Beverly Act, which compels relief under Commercial Code sections 2711 et al.

The third cause of action, alleged against Ford only, was for violation of Civil Code section 1793.2, subdivision (b) of the Song-Beverly Act. Ballesteros asserted that Ford sold the Explorer in California, that the sale was "accompanied by express warranties, including a warranty guaranteeing that the [Explorer] was safe to drive and not equipped with defective parts,"

5

and that Ford thereby undertook service and repair duties that it later breached.  Ballesteros alleged that he was entitled to reimbursement, rescission, and/or other remedies.

### C.  Motion to Compel Arbitration

In January 2023, Fairview and Ford moved to compel arbitration based on the Arbitration Provision.  Although not a signatory to the Contract, Ford urged that it could compel arbitration under the Contract pursuant to an equitable estoppel theory.  Ford argued that Ballesteros's claims arose out of the Contract, and because Ballesteros was relying on the Contract to sue Ford, he could not avoid the Arbitration Provision that the Contract contained.  As authority, Ford relied primarily on *Felisilda, supra,* 53 Cal.App.5th 486.

Ballesteros opposed the motion, arguing that *Felisilda* was incorrectly decided for the reasons stated in *Ford Warranty*, *supra,* 89 Cal.App.5th 1324, review granted.  Ballesteros explained that his claims against Ford were not based on obligations contained in the Contract but on independent warranties recognized or established by the Song-Beverly Act.

The trial court granted the motion to compel arbitration as to Fairview but denied it as to Ford, concluding that *Ford Warranty* was "better reasoned" than *Felisilda*.  Ford timely appealed.

## II. DISCUSSION

With certain exceptions not applicable here, Code of Civil Procedure section 1281.2 provides that "the [trial] court shall order the petitioner [seeking arbitration] and the respondent [resisting arbitration] to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists."  The Contract does not explicitly require Ballesteros to arbitrate any claim he might have against Ford.  In other words, no

6

"agreement to arbitrate the controversy exists" between Ballesteros and Ford. (Code Civ. Proc., § 1281.2.)  The question, therefore, is whether Ballesteros should nonetheless be compelled to arbitrate because, after signing the Contract with Fairview, he sought relief for his defective car under the Song-Beverly Act.

Applying de novo review (*Ford Warranty, supra*, 89 Cal.App.5th at p. 1331, review granted), we conclude that Ford cannot compel Ballesteros to arbitrate.  Ford was not a party to the Contract, so Ford cannot invoke the Arbitration Provision.  It would not be equitable to rule otherwise, because Ford's causes of action do not rely on the Contract, the Contract sets forth obligations only between Ballesteros and Fairview, and no inequity results from allowing Ballesteros to pursue his statutory claims against Ford in court.  Ford's arguments to the contrary have been repeatedly rejected by other courts of appeal – for good reason.

A.  <u>Ford Was Not a Party to the Arbitration Provision</u>

"Even the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement."  (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 245; *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744 [there is no public policy compelling anyone to arbitrate controversies they have not agreed to arbitrate].)  Because arbitration is a matter of contract, a nonsignatory to an arbitration agreement generally cannot invoke it.  (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352; *Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.* (2005) 129 Cal.App.4th 759, 763 ["Generally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it"].)  Absent a clear and

7

unmistakable agreement to arbitrate, courts will not infer the waiver of the right to a jury trial. (*Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.* (1985) 164 Cal.App.3d 1122, 1129.) The nonsignatory therefore "bears the burden" of establishing that it can enforce the arbitration agreement. (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 15.)

Here, it is undisputed – but bears emphasizing – that there was never any agreement between Ballesteros and Ford to arbitrate anything. Ford is not a party or signatory to the Contract that contains the Arbitration Provision. Moreover, given the Contract's identification of "[y]ou" as Ballesteros and " 'we' " and " 'us' " as Fairview, the Arbitration Provision effectively states that only "*[BALLESTEROS] OR [FAIRVIEW]* MAY CHOOSE TO HAVE ANY DISPUTE, EXCEPT AS STATED BELOW, BETWEEN [THEM] DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL" and that only a "claim or dispute . . . *between [Ballesteros] and [Fairview]* or *[Fairview's]* employees, agents, successors or assigns" is subject to arbitration. (Italics added.) Ford is not "you," "we," or "us." Nor is Ford an employee, agent, successor, or assign of Fairview.

B. <u>There is No Basis for Equitable Estoppel</u>

Ford nevertheless contends that Ballesteros should be equitably estopped from resisting Ford's arbitration demand. We disagree.

1. <u>Equitable Estoppel</u>

The term "equitable estoppel" has long been used to describe an exception to " 'the general rule that a non[-]signatory to an agreement cannot be compelled to arbitrate and cannot invoke an agreement to arbitrate, without being a party to the arbitration agreement.' " (*JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1236–1237 (*JSM Tuscany*); *Metalclad Corp. v. Ventana Environmental Organizational Partnership*

8

(2003) 109 Cal.App.4th 1705, 1713 (*Metalclad*) ["Equitable estoppel precludes a party from asserting rights 'he otherwise would have had against another' when his own conduct renders assertion of those rights contrary to equity"].) At its heart, the equitable estoppel exception means that a party who signs a contract with an arbitration provision " 'cannot, on the one hand, seek to hold [a] non[]signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non[]signatory.' " (*Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 220.) " 'The fundamental point' is that a party is 'not entitled to make use of [a contract containing an arbitration provision] as long as it worked to [the party's] advantage, then attempt to avoid its application in defining the forum in which [the] dispute . . . should be resolved." (*Jensen v. U-Haul Co. of California* (2017) 18 Cal.App.5th 295, 306; see Civ. Code, § 3521 ["A person who takes the benefit must bear the burden].)[2]

The issue, then, is whether a plaintiff's claims against a nonsignatory are so tethered to the terms of a contract that the plaintiff should have to arbitrate them pursuant to an arbitration provision in the contract. These circumstances are limited. It is not enough that the complaint "makes reference" to an agreement containing an arbitration clause or includes

---

[2]    We recognize that the term "equitable estoppel" may be a bit of a misnomer, because the theory justifying enforcement of an arbitration provision by a nonsignatory does not require the nonsignatory's detrimental reliance on the signatory's words or conduct, as traditional equitable estoppel doctrine would. We also note that the respondent and amici curiae in *Ford Warranty* have argued before our high court that many of the decisions applying equitable estoppel to compel arbitration are erroneous because they treat arbitration agreements differently from other contracts by failing to require detrimental reliance. We do not address this argument because Ballesteros never made it.

9

claims that " 'presum[e] the existence of' " such an agreement. (*Goldman*, *supra*, 173 Cal.App.4th at pp. 218, 231.) Instead, the causes of action against the nonsignatory must be " 'intimately founded in and intertwined' with the underlying contract obligations." (*Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 271 (*Boucher*)). Indeed, there must be "actual reliance on the terms of the agreement" (*Goldman*, at p. 231), and the causes of action must premise liability on "duties *imposed by the agreement*" itself (*id*. at p. 220, italics added). (See *Namisnak v. Uber Technologies, Inc.* (9th Cir. 2020) 971 F.3d 1088, 1095 ["equitable estoppel is 'inapplicable where a plaintiff's allegations reveal no claim of any violation of any duty, obligation, term or condition' imposed by the contract"].)

As discussed next, Ballesteros's causes of action against Ford under the Song-Beverly Act are not so intimately intertwined with the Contract that equity demands he arbitrate them.

### 2. *Ford Warranty* and Subsequent Cases

*Ford Warranty, supra,* 89 Cal.App.5th 1324, review granted, is directly on point. There, the plaintiffs had purchased Ford cars from a dealer under a preprinted "RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION)" like the Contract at issue here. Ford was not a signatory to those contracts. The contracts contained the same arbitration provision and warranty disclaimer as in this case. (*Id*. at pp. 1329–1330.) The plaintiffs sued Ford under various legal theories including the Song-Beverly Act. (*Ford Warranty*, at p. 1330.) Ford moved to compel arbitration, contending that the plaintiffs were equitably estopped from avoiding the arbitration provision in the sale contracts because the warranties underlying their claims arose from the purchase of their cars. (*Id*. at p. 1331.) The trial court denied the motion. (*Ibid*.)

10

The court of appeal affirmed, holding that the plaintiffs' claims were not sufficiently intertwined with the sale contracts to give rise to equitable estoppel. (*Ford Warranty, supra,* 89 Cal.App.5th at p. 1333.) The plaintiffs' claims did not allege any violation of the express terms of the contracts. (*Id.* at p. 1335.) Instead, they were based on Ford's statutory obligations to reimburse consumers or replace their cars when the cars were not repaired in accordance with warranties recognized or established by the statute. (*Ibid.*) These warranties did not arise from the sale contracts, because the contracts did not set forth any warranty or other assurance about the quality of the cars or any promise of repair. (*Ibid.*) "In short, the substantive terms of the sale contracts relate to sale and financing and nothing more." (*Ibid.*) Indeed, "[m]anufacturer vehicle warranties that accompany the sale of motor vehicles without regard to the terms of the sale contract between the purchaser and the dealer are *independent* of the sale contract." (*Id.* at p. 1334, italics added; see *id.* at pp. 1335–1336 ["California law does not treat manufacturer warranties imposed outside the four corners of a retail sale contract as part of the sale contract," citing *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 60 (*Greenman*) [distinguishing a seller's warranty obligations to the buyer pursuant to contract and manufacturer warranties "that arise[] *independently of a contract of sale* between the parties," italics added]; *Corporation of Presiding Bishop of Church of Jesus Christ of Latter Day Saints v. Cavanaugh* (1963) 217 Cal.App.2d 492, 514 (*Cavanaugh*) [manufacturer's express warranty "was *not part of a contract of sale* between the manufacturer and the plaintiff," italics added].)

Since *Ford Warranty*, every published court of appeal decision considering the issue has agreed with its holding, as do we. (See, e.g., *Montemayor v. Ford Motor Co.* (2023) 92 Cal.App.5th 958, 968–972 (Second

11

Appellate District), review granted Sept. 20, 2023, S281237; *Kielar v. Superior Court* (2023) 94 Cal.App.5th 614, 619–621 (Third Appellate District), review granted Oct. 25, 2023, S281937; *Davis, supra,* 100 Cal.App.5th 825, 837 (Fourth Appellate Dist.), review granted May 29, 2024, S284697; *Yeh, supra,* 95 Cal.App.5th 264, 269–279 (First Appellate Dist.), review granted Nov. 15, 2023, S282228; *Rivera v. Superior Court* (2024) 105 Cal.App.5th 288, 293–295 (Second Appellate District), review granted Dec. 18, 2024, S287725.)[3]

C. Ford's Arguments Are Unpersuasive

Ford disagrees with *Ford Warranty*, urging us to follow the Third District's earlier decision in *Felisilda, supra,* 53 Cal.App.5th 486. Ford also refers us to equitable estoppel cases outside the vehicle warranty context and insists that the warranties underlying Ballesteros's claims arose from the Contract based on Ballesteros's complaint and the Commercial Code. None of these arguments withstands scrutiny.

1. *Felisilda*

*In Felisilda,* the plaintiff car-buyers asserted a single cause of action against a car dealership, with whom they had agreed to arbitrate, and the car's manufacturer, with whom they had not. (*Felisilda, supra,* 53 Cal.App.5th at p. 491.) The dealer moved to compel arbitration of the entire case. Over the plaintiffs' objection, the trial court granted the motion.

---

[3] The majority in *Davis* agreed with *Ford Warranty*. (*Davis*, *supra,* 100 Cal.App.5th at p. 837, review granted.) The dissent did not. (*Id.* at pp. 844–858 (dis. opn. of Irion, J.) [manufacturer warranties should be treated as arising out of the contract between the buyer and the seller because, among other things, a contract under the Commercial Code contains all legal obligations between the parties and an express warranty is part of the benefit of the bargain].) We side with the majority for the reasons stated in its opinion and our discussion below.

The plaintiffs thereafter dismissed the dealer from the action and, without revisiting the propriety of arbitrating against a nonsignatory, arbitrated their cause of action against the manufacturer.  The manufacturer prevailed, the court confirmed the arbitrator's decision, and the plaintiffs appealed, contending they should not have been ordered to arbitrate their claim against the nonsignatory manufacturer.  (*Id*. at pp. 489–491.)

The court of appeal affirmed, concluding that "the sales contract was the source of the warranties at the heart of [the] case" because the complaint alleged that express warranties accompanied the sale.  And because the plaintiffs agreed in the contract to arbitrate claims arising out of the car's condition, they were estopped from refusing to arbitrate their claim against the nonsignatory.  (*Felisilda, supra*, 53 Cal.App.5th at pp. 496–497.)  The court further noted that the plaintiffs "expressly agreed to arbitrate claims arising out of the condition of the vehicle – even against third party nonsignatories to the sales contract."  (*Ibid*.)

*Felisilda* arose in a markedly different procedural context than we have here, since the arbitration with the manufacturer in *Felisilda* had already transpired.  In any event, we disagree with *Felisilda*'s analysis for the reasons expressed in *Ford Warranty*.  Contrary to *Felisilda*'s conclusion, the sales contract could not be the source of the warranties underlying the plaintiffs' claim against the manufacturer, both because the contract did not set forth any warranties and because the manufacturer was not a party to the contract.  (See *Ford Warranty, supra*, 89 Cal.App.5th at pp. 1333–1336, review granted.)  Furthermore, *Felisilda*'s assertion that the plaintiffs "expressly agreed to arbitrate claims . . . even against third party nonsignatories to the sales contract" misreads the contract.  There, as here, the arbitration clause only called for arbitration of claims and disputes

13

"between" the *signatories* if the claim or dispute "arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including *any such relationship with third parties who do not sign this contract*)," upon the "election" of a *signatory*. (Italics added.) The reference to a claim arising out of a relationship with a nonsignatory is part of the definition of the types of claims that the signatories themselves – in this case, Ballesteros or Fairview – could arbitrate if one of them elected to do so; it did not expand who could compel arbitration. (*Ford Warranty*, at pp. 1334–1335, review granted; *Yeh, supra*, 95 Cal.App.5th at p. 278, review granted.) *Felisilda* is of no help to Ford.

### 2. Ford's Attacks on *Ford Warranty*

Besides disagreeing with *Ford Warranty*'s criticism of *Felisilda*, Ford argues that *Ford Warranty* erroneously concluded that equitable estoppel could arise only if the plaintiff's claim alleged a breach of an express term of the contract. Ford contends that *Ford Warranty*'s conclusion " 'ignores the fact that a claim " 'arising out of' " a contract does not itself need to be contractual,' " quoting *Garcia v. Pexco, LLC* (2017) 11 Cal.App.5th 782, 786 (*Garcia*).

The cases on which *Garcia* relied, however, pertained to the scope of the arbitration provision – that is, the type of claims that contractual signatories had agreed to arbitrate – not whether a nonparty could invoke an arbitration provision under an equitable estoppel theory. (*Garcia, supra,* 11 Cal.App.5th at p. 786, citing, e.g., *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686.) In any event, the point here is not whether Ballesteros's causes of action against Ford sounded in contract or in tort, but whether those warranty claims relied on the

14

obligations imposed by the Contract between Ballesteros and Fairview. They did not, because the Contract did not impose any warranties, much less any obligations, on Ford.[4]

Ford also attacks *Ford Warranty's* conclusion that manufacturer warranties can arise independently of a purchaser's contract with the dealer, claiming that the cases on which *Ford Warranty* relied for that proposition – *Greenman* and *Cavanaugh* – predate the Commercial Code. That theory has already been rejected by another Division in this District, because the Commercial Code did not change existing law in this regard. (*Yeh*, *supra*, 95 Cal.App.5th at p. 275, review granted.) As we explain later, Ford fails to demonstrate otherwise. (See, *post*, at pp. 21–26.)

### 3. Other Equitable Estoppel Cases

Hedging its bet on *Felisilda*, Ford tells us that "*Boucher*, *Rowe*, and *JSM Tuscany* are particularly instructive" and support its position. (See *Boucher, supra,* 127 Cal.App.4th 262; *Rowe v. Exline* (2007) 153 Cal.App.4th 1276 (*Rowe*); *JSM Tuscany, supra,* 193 Cal.App.4th 1222.) But none of those cases involved a situation where, as here, a car manufacturer sought to compel arbitration of Song-Beverly Act claims based on an installment sales contract to which it was not a party. Indeed, in each of those cases, the

---

[4] Although Ford does not mention it, *Garcia* has been criticized by federal and state courts alike. (See *Soltero v. Precise Distribution, Inc.* (2024) 102 Cal.App.5th 887, 894–897 (*Soltero*) [citing cases].) "For several reasons, we agree that *Garcia* misapplied California law" (*Soltero*, at p. 895), by relying on the idea that the arbitration provision was broad enough to cover statutory claims, and by failing to explain how those claims relied on the substantive terms of the contract containing the arbitration clause (see *id*. at pp. 895–-897). One court of appeal has, in turn, disagreed with *Soltero* on some of its points in the context of litigation against joint employers. (See *Gonzalez v. Nowhere Beverly Hills LLC* (2024) 107 Cal.App.5th 111, 126–128.) But we are not confronted with a joint employer scenario here.

15

nonsignatory, unlike Ford, had an " 'integral' " relationship to a signatory, which contributed to the equity of requiring arbitration. (*Boucher*, at pp. 270, 272; see also *Gonzalez v. Nowhere Beverly Hills, supra*, 107 Cal.App.5th at p. 125 [relationships between signatories and nonsignatories "inform whether the plaintiff's claims are intertwined with any underlying contractual obligations"]; *Jarboe v. Hanless Auto Group* (2020) 53 Cal.App.5th 539, 554 [affirming denial of arbitration because the relationship between the nonsignatory and signatory "has not been shown to be *integral* to support the application of equitable estoppel"]; *JSM Tuscany*, at p. 1238 [" 'Courts applying equitable estoppel against a signatory have "looked to the *relationships of persons*, wrongs and issues," ' " italics added].) Finally, all of the cases predated *Ford Warranty*, and each one is distinguishable because, unlike here, the plaintiffs' claims sought to enforce the actual terms of the contract containing the arbitration clause.

In *Boucher, supra,* 127 Cal.App.4th at page 266, the plaintiff had entered an employment contract with a title company (Financial) and, as part of that contract, agreed to arbitrate any disputes arising out of it. Financial thereafter transferred its operations and assets to another company (Alliance Title). (*Id.* at p. 268.) After the plaintiff's employment ended, he sued Financial and Alliance Title for *breach of the employment contract* and related statutory claims. He also alleged that Alliance Title interfered with prospective economic relations and performance of the contract. (*Id.* at pp. 265–266, 272.) The defendants moved to compel arbitration under the contract, and the trial court denied the motion as to Alliance Title. (*Id.* at p. 266.) The court of appeal held that, although Alliance Title was a nonsignatory, it could enforce the arbitration clause because the plaintiff's claims relied on, referred to, and presumed the existence of the contract

16

containing that clause, even alleging that Alliance Title breached the contract. (*Id.* at pp. 271–273.) Here, by contrast, Ballesteros did not contend that Ford breached the Contract or induced a breach. And Ford's relationship with Fairview is far more remote than the relationship between Financial and its successor, Alliance Title.

In *Rowe, supra,* 153 Cal.App.4th 1276, the plaintiff's contract with his corporate employer included provisions for a $175,000 severance payment and arbitration of disputes. The plaintiff sued the employer, as well as two individual directors who had not signed the contract (as alter egos of the corporate signatory), for violation of statutes and recovery of the severance payment. (*Id.* at pp. 1280–1281.) On appeal, we concluded that the plaintiff was equitably estopped from refusing to arbitrate with the nonsignatory directors, because regardless of the legal theory asserted, the plaintiff alleged that the claims were brought pursuant to the contract and sought a specific sum owed under that contract. (*Id.* at pp. 1287–1289.) Here, by contrast, Ballesteros did not allege that Ford was an alter ego of Fairview or that his causes of action against Fairview were brought pursuant to the Contract. (*Id.* at p. 1287.)

The plaintiffs in *JSM Tuscany, supra,* 193 Cal.App.4th at page 1234, some of whom had signed real estate purchase contracts containing an arbitration provision, sued the defendants, some of whom were parties to those agreements, for breach of the agreements and other matters. The court of appeal held that the plaintiffs could be compelled to arbitrate their claims for *breach* of the agreements that contained the arbitration clause and claims that were "based upon the *obligations created by*" those contracts. (*Id.* at pp. 1241–1242, italics added.) Here, Ballesteros did not sue Ford for breach of the Contract or any obligations created by the Contract. And Ford is not

17

sufficiently "related" to or "affiliated" with Fairview to justify its enforcement of the Arbitration Provision against Ballesteros. (*Id.* at p. 1238.) Like *Boucher* and *Rowe*, *JSM Tuscany* is factually inapposite.

### 4. Remedies of Rescission and Reimbursement

Ford argues that Ballesteros's claims are intertwined with the Contract because he seeks rescission of the Contract. The argument is untenable. Revocation of a consumer contract is expressly authorized by the Song-Beverly Act. (Civ. Code, § 1794.) Moreover, rescission is a remedy affecting Fairview, not Ford, because only Fairview entered into the Contract that Ballesteros seeks to rescind.[5] Nothing about Ballesteros revoking acceptance of the car from Fairview (or the Contract with Fairview) and seeking rescission should compel him to arbitrate his statutory claims against Ford. (*Davis, supra*, 100 Cal.App.5th at p. 844, review granted [plaintiff's request for rescission of the contract and revocation of the acceptance of the vehicle did not give rise to equitable estoppel]; *Kramer v. Toyota Motor Corp.* (9th Cir. 2013) 705 F.3d 1122, 1131–1132 [same].)

Ford also points out that Ballesteros seeks "reimbursement of the price paid for the [Explorer] less that amount directly attributable to use by [Ballesteros] prior to the first presentation of the nonconformities." Because the "price paid" (and finance charges) are stated in the Contract, Ford argues that Ballesteros is relying on the Contract terms to obtain reimbursement on his causes of action.

---

[5] Where the buyer has revoked acceptance under the Song-Beverly Act, specified provisions of the Commercial Code come into play. (Civ. Code, § 1794, subd. (b)(1).) The right to revoke acceptance is available only to the contracting parties. (See Cal. U. Com. Code, § 2711 [buyer may reject or revoke acceptance of the contract]; *id.*, § 2608(2) [revocation of acceptance "is not effective until the buyer notifies the seller of it"].)

Again, we disagree.  Reimbursement for (or restitution of) the price paid in a transaction is a remedy explicitly provided by the Song-Beverly Act upon proof that the Act was violated.  (Civ. Code, §§ 1793.2, subd. (d)(2)(B) [restitution], 1794, subd. (b) [measure of damages includes reimbursement pursuant to Civil Code section 1793.2].)  Indeed, the Act defines restitution in a way that distinguishes it from restitution obtainable at common law.  (See *Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 806–810 & fn. 5.)

Accordingly, Ford's obligation to reimburse Ballesteros and the method by which that reimbursement is calculated derive from the Song-Beverly Act rather than from the Contract.  The Contract does record the amount Ballesteros initially paid and provides a basis for calculating finance charges, but that merely suggests that the Contract is one of many documents that could be used as *evidence* of the amount of reimbursement Ford ultimately must provide under the Act.  The potential evidentiary value of the Contract itself does not make the Contract the *source* of Ford's reimbursement obligation.  Nor does it mean that Ballesteros's claims are so intertwined with the Contract that he must forego his right to litigate in court.

Ford tells us that in *Rowe*, s*upra*, 153 Cal.App.4th at page 1287, we found that statutory claims seeking recovery of amounts owed under the contract relied upon, made reference to, presumed the existence of, and were intertwined with the contract.  But in *Rowe*, our conclusion was not based on the mere fact that the claims against the nonsignatories sought restitution of an amount evidenced by the contract.  Rather, it was based on the fact that one of the claims against the nonsignatories was for *breach of the contract itself* and alleged that the nonsignatories were alter egos of the signatories.  Moreover, two of the other causes of action not only sought damages for amounts owed under the contract but were alleged to be made " 'pursuant to

19

THE CONTRACT' " containing the arbitration clause. (*Ibid.*) *Rowe* is therefore distinguishable.

Ford also points to Justice Irion's dissent in *Davis*, arguing that Ballesteros will have to rely on the Contract to establish his standing to proceed under the Song-Beverly Act and "to establish the date the warranties took effect, so that [he] can prove the warranties were in effect" at the relevant time. (*Davis, supra,* 100 Cal.App.5th at pp. 852–853 (dis. opn. of Irion, J.).) We question whether admission of the Contract into evidence is the only way to lay a foundation for his Song-Beverly Act claims. But even if it is, the evidentiary use of the Contract to pursue a Song-Beverly Act claim does not convert the claim into one based on the Contract.

### 5. Contract as Source of Warrantor-Warrantee Relationship

Ford next argues that Ballesteros's claims are intertwined with the Contract because they are based on warranty obligations that were "contemplated by" the complaint and the Contract. This "contemplat[ion]" supposedly appears in the Arbitration Provision's reference to claims arising from relationships with third parties – a theory we have already debunked. (See, *ante*, at pp. 13–14.) Ford nonetheless argues that the Contract is the source of the purported warrantor-warrantee relationship between Ford and Ballesteros.

Ford is incorrect. The Contract does not purport to describe any relationship between Ballesteros and Ford, let alone a relationship of warrantor and warrantee. Ford is not a party to the Contract or even named in it. The Contract does not affirm the existence of any warranty from Ford or anyone else. The Contract's disclaimer of Fairview's warranties does state that it "does not affect any warranties covering the vehicle that the vehicle manufacturer may provide." But that disclaimer merely recognizes the

20

*potential* existence of warranties from Ford that arise *outside* the Contract, not that the Contract itself imposes any warranties. (See *Ford Warranty*, *supra*, 89 Cal.App.5th at pp. 1330, 1335, review granted; *Montemayor*, *supra*, 92 Cal.App.5th at p. 970, review granted; *Kielar*, *supra*, 94 Cal.App.5th at p. 620, review granted; *Yeh*, *supra*, 95 Cal.App.5th at p. 277, review granted; *Davis*, *supra*, 100 Cal.App.5th at p. 837, review granted.)

### 6. Contract as Source of Warranties

Finally, Ford argues that the Contract is the source of the warranties underlying Ballesteros's causes of action in light of the Commercial Code. Its arguments are unavailing.[6]

Ford asserts that Ballesteros's purchase of his car was " 'a sale . . . accomplished by the making of the contract,' i.e., a 'present sale.' " (Cal. U. Com. Code, § 2106(1).)[7] From this, Ford insists that "every reference to

---

[6]    For this proposition, Ford initially cites *Mance v. Mercedes-Benz USA* (N.D.Cal. 2012) 901 F.Supp.2d 1147 (*Mance*). In *Mance*, a federal district court ruled that a car manufacturer's duty to comply with its warranty arose when the purchaser bought the car and that the purchaser's breach of warranty claim was based on and arose out of the contract because he would not have received the warranty if he had not signed the contract. (*Id.* at p. 1157.) *Mance*'s analysis, however, has since been rejected by other federal courts, including the Ninth Circuit. (*Ezell v. Mercedes-Benz United States* (C.D.Cal. Oct. 18, 2021, 2:21-cv-06001-SB-MAA), 2021 U.S. Dist. Lexis 246040 fn. 1 [confirming that *Mance* " 'is no longer good law' "]; *Amergence Supply Chain Mgmt. Inc. v. Changhong (Hong Kong) Trading Ltd.* (C.D.Cal. Apr. 21, 2016, CV-15-9976-MWF) 2016 U.S. Dist. LEXIS 197369 [*Mance* "is no longer good law in light of the Ninth Circuit's decisions"]; *Kramer, supra,* 705 F.3d at p. 1132 [rejecting nonsignatory manufacturer's argument that the plaintiff's California consumer law claims were intertwined with the contract between the plaintiffs and the dealership because they relied on the existence of the vehicle purchase transaction].)

[7]    The cited portion of the Commercial Code actually states: "In this division unless the context otherwise requires 'contract' and 'agreement' are

21

either the sale or the purchase necessarily implicates that contract." Furthermore, Ford argues that the Commercial Code treats warranties as contractual terms. (Citing Cal. U. Com. Code, §§ 2314 ["a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind"] & 1201, subd. (12) [defining a "contract" as "the *total legal obligation* that results from the parties' agreement as determined by [the code] and as supplemented by any other applicable laws," italics added]; *Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1200 [" ' "A warranty is a contractual term concerning some aspect of the sale, such as title to the goods, or their quality or quantity" ' "]; *A.A. Baxter Corp. v. Colt Industries, Inc.* (1970) 10 Cal.App.3d 144, 153 [warranty is part of the contract of sale and "not a mere collateral undertaking"].) Thus, the theory goes, the warranties arising from the sale of Ballesteros's car must be intertwined with the Contract between Ballesteros and Fairview, so Ballesteros's warranty claims against Ford must be subject to arbitration.

As multiple courts of appeal have explained, however, Ford's arguments are incorrect. Even if a sale is defined as a contract between the seller and the buyer (which it is not), it does not mean that the obligations of a third party due to that sale are part of or circumscribed by the writing that only the seller and buyer chose to sign. To the contrary, the Commercial Code makes clear that express and implied warranties may arise *apart* from

_____

limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price []. A 'present sale' means a sale which is accomplished by the making of the contract." (Cal. U. Com. Code, § 2106(1).) Thus, the Commercial Code appears to distinguish between the sale itself and the contract for sale.

a contract between the buyer and seller. That is where the Song-Beverly Act steps in, affirming warranties created in the absence of privity. And under that Act, manufacturer warranties arise from the event of a sale but not necessarily from the written sales contract containing an arbitration provision.

### a. Warranties May Exist Apart from the Sales Contract

The Commercial Code's express warranty provisions are limited to warranties given by the seller directly to the buyer. (*Davis, supra*, 100 Cal.App.5th at p. 838, review granted; Cal. U. Com. Code, §§ 2313, subd. (1)(a) & 2103, subd. (1)(d).) Moreover, "the warranty sections . . . are not designed in any way to disturb those lines of law growth which have recognized that *warranties need not be confined either to sales contracts or to the direct parties to such a contract.*" (Official Comments on Cal. U. Com. Code, Deering's Ann. Cal. U. Com. Code (2024 ed.) foll. § 2313, italics added.) In other words, while express warranties apply under the Commercial Code only to a seller in privity with the buyer, the buyer may sue a third-party manufacturer for breach of an express warranty in the absence of privity. (*Davis,* at pp. 838–839.)

Similarly, implied warranties arise under the Commercial Code only for a merchant or seller in privity with the buyer. (Cal. U. Com. Code, §§ 2314, 2315.) But where there are no direct dealings between a manufacturer and purchaser, the *manufacturer's* warranties – express *or* implied – generally fall outside the scope of the Commercial Code and are governed by other provisions of law. (*Davis, supra*, 100 Cal.App.5th at pp. 839–840, review granted.) The Commercial Code does not consider those manufacturer warranties part of the contract between the buyer and seller. (*Ibid.*)

23

Nor is a manufacturer's warranty necessarily a part of the sales contract merely because the Commercial Code defines a "contract" to mean "the total legal obligation that results from the parties' agreement as determined by this code and as supplemented by any other applicable laws." (Cal. U. Com. Code, § 1201, subd (b)(12).) This definition of a contract refers to the legal obligations of the *contracting* parties, not the legal obligations of strangers to the contract such as a manufacturer. (*Davis*, *supra*, 100 Cal.App.5th at p. 840, review granted.) To the extent that the Commercial Code considers warranties from seller to buyer to be part of their sales contract, it does not preclude the buyer from pursuing the manufacturer for warranties or deem them part of the buyer-seller agreement.[8]

### b. *Ballesteros's Claims Are Brought Under the Song-Beverly Act*

Ballesteros brought his claims under the Song-Beverly Act, not the Commercial Code (or the Contract). The Act was enacted to give consumers better protection than what the Commercial Code affords. As such, the Act supplements the Commercial Code but prevails over any conflicting provisions of that code. (Civ. Code, § 1790.3.)

The Song-Beverly Act explicitly governs manufacturer warranties and does not require privity. Ballesteros's warranty-based claims are brought under the Act to obtain relief from Ford for its breach of statutory obligations

---

[8] Ford urges that California law treats warranties as contractual obligations in another way. Under the Commercial Code, the statute of limitations for breaches of warranty (brought under the Song-Beverly Act or otherwise) is governed by the Commercial Code section for breaches of an action for "breach of any contract for sale." (Cal. U. Com. Code, § 2725; *Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 642.) This argument was found unpersuasive in *Ford Warranty, supra*, 89 Cal.App.5th at page 1336, review granted, and Ford offers no rebuttal.

arising from the sale of his car. They are not founded on any term of the Contract. (*Davis, supra*, 100 Cal.App.5th at p. 842, review granted; *Yeh, supra*, 95 Cal.App.5th at p. 278, review granted.) It therefore cannot be said that his claims are so intertwined with the Contract that he is equitably estopped from pursuing them in court. (See *Mattson Technology, Inc. v. Applied Materials, Inc.* (2023) 96 Cal.App.5th 1149, 1157–1158 (*Mattson*) [no equitable estoppel where the plaintiff's statutory trade secrets claim existed without regard to the signatory's contractual obligations to the plaintiff]; *UFCW & Employers Benefit Trust v. Sutter Health* (2015) 241 Cal.App.4th 909, 929 [no equitable estoppel where the plaintiff alleged statutory claims for unlawful competition and antitrust rather than claims relying on the contract].)

Moreover, Ford's insistence that a "sale" necessarily implicates the buyer-seller "contract" under the Commercial Code rings hollow given the definitions set forth in the Song-Beverly Act. The Act defines an express warranty as "a written statement arising out of a *sale*." (Civ. Code, § 1791.2, subd. (a)(1), italics added.) Further, every retail "*sale* of consumer goods . . . shall be accompanied by the manufacturer's . . . implied warranty that the goods are merchantable" unless properly disclaimed. (Civ. Code, § 1792, italics added.) Under the Act, like the Commercial Code, a " '[s]ale' means. . . [t]he passing of title from the seller to the buyer for a price [or a] consignment for sale." (Civ. Code, § 1791, subd. (n).) But unlike the Commercial Code, the definition of "sale" in the Act does *not* even refer to a contract, let alone suggest that anything arising from a "sale" must necessarily be deemed to arise under the buyer-seller agreement. (See *Ngo v. BMW of N. Am., LLC* (9th Cir. 2022) 23 F.4th 942, 950 [the sale – the fact that the purchaser bought a car – and not the purchase agreement, is what gives a plaintiff

standing to sue under the Song-Beverly Act]; *Yeh, supra*, 95 Cal.App.5th at p. 277, review granted ["an express warranty arises out of a sale rather than the underlying contracts"].) We find Ford's Commercial Code arguments unconvincing.

D. Equity

In the end, debates over whether a "sale" is coextensive with the buyer-seller agreement or whether a third-party manufacturer's warranty somehow finds its genesis in an agreement to which the manufacturer was not a party should not obscure the overriding concern in equitable estoppel cases such as these. The salient question is not whether a sale is distinguishable from a contract per se, but whether the nonsignatory has proven that it would be *unfair* to allow the plaintiff to proceed with his claims in court. (*Goldman, supra*, 173 Cal.App.4th at p. 220 [" '[T]he linchpin for equitable estoppel is equity – fairness' "]; *Mattson, supra*, 96 Cal.App.5th at p. 1156 [fairness "helps define the limits of the [equitable estoppel] rule"].) The true source of a manufacturer's warranties may inform that inquiry, but it does not necessarily answer it.

In applying equitable estoppel, we must remain mindful that it is an *exception*. It is an exception to the fundamental and commonsense notion that a person or entity who has not signed a contract is neither bound by its terms nor allowed to invoke them. It is also an exception to the premise that the reasonable expectations of the parties at the time of contracting will govern how they must perform under the contract.

As a result, the equitable estoppel exception should be narrowly tailored, properly reserved only for those rare situations in which fairness cries out for us to set aside these bedrock principles of California contract law and deem the plaintiff to have given them up. Indeed, the point of equitable

26

estoppel is that the purchaser – although not expecting at the time of contracting to have to arbitrate with a nonsignatory – should thereafter reasonably expect to arbitrate if it decides to sue the nonsignatory on a claim clearly tethered to the contract and there exists a sufficient relationship between the nonsignatory and a signatory. (See *Rowe*, *supra*, 153 Cal.App.4th at pp. 1289–1290.)

Based on the language of the Contract, no purchaser would reasonably expect at the time of contracting that the Contract imposed any obligations on the car manufacturer. And based on the language of the Arbitration Provision, no purchaser would reasonably expect at the time of contracting that it was giving up any rights against anyone other than the dealer. Finally, based on their knowledge of the distinction between the dealer and the manufacturer at the time of contracting, no purchaser would reasonably expect that the manufacturer would have the right to enforce any term of the sales contract between the purchaser and the dealer.

So what exactly did Ballesteros do that would compel us to say he should be barred from pursuing his Song-Beverly Act claims against Ford in court? Nothing. Ballesteros wanted to buy a car. To finance that sizeable purchase, Fairview, but not Ford, required him to sign a preprinted form – bearing all the hallmarks of an adhesion contract – stating that Fairview could force him to arbitrate any claims that he might have against Fairview. (For whatever reason, Ford apparently does not require its dealers to include in their retail installment contracts any language that claims against *Ford* would be arbitrated too.) When Ballesteros's Explorer allegedly turned out to be an unrepairable lemon, Ballesteros turned to the Song-Beverly Act – the statute that our Legislature enacted to protect consumers from this very predicament. That statute explicitly gives consumers like Ballesteros a

27

remedy against car manufacturers like Ford regardless of the terms of any sales contract. Ballesteros had no reason to believe that Ford, by virtue of its relationship to Fairview, had assumed any obligations under his Contract with Fairview. And Ballesteros did *not* sue to enforce any obligations stated in his Contract with Fairview, let alone contend that Ford should be responsible for the obligations that Fairview undertook under that Contract. He merely filed a Song-Beverly Act claim against a manufacturer, and his act of doing so does not justify stripping him of his right to pursue relief against Ford in court. Based on the reasonable expectations of the actual contracting parties, it is difficult, if not impossible, to see any unfairness to Ford if it is barred from enforcing the Arbitration Provision. This is especially so where, as here, Ballesteros's complaint would be no different if he had paid in cash and had not signed the contract with Fairview. (See *Fuentes v. TMCSF, Inc.* (2018) 26 Cal.App.5th 541, 553 [finding that the plaintiff's claims did not rely on the contract with an arbitration provision because "[e]ven if he had paid cash for the motorcycle, his complaint would be identical"].)

Indeed, Ford does not explain any circumstance in which a plaintiff who has purchased a new car *could* go to court on a Song-Beverly Act claim under the theory it proposes. In what instance would a new car sale not be accompanied by some writing from the dealer that contains an arbitration clause? While manufacturers might rejoice in the idea that such customer-dealer documents automatically insulate them from ever having to face a jury for an alleged breach of a statutory warranty, that is certainly not what the Legislature could have intended when it enacted the Act or the Commercial Code. (See *Mattson, supra*, 96 Cal.App.5th at p. 1158 [acknowledging similar equitable concerns].)

28

But we need not confine our analysis to new car purchases to see the error of Ford's position. Most people purchase goods through third party retailers, rather than directly from the manufacturer. Nowadays, many of those purchases occur through online retailers – many of whom include a provision on their web site requiring the arbitration of any disputes between the purchaser and the retailer. Those online retailers typically have minimal connections to the manufacturer of the purchased goods. Both the purchaser and the online retailer would likely be shocked to discover that the purchaser's claims against the manufacturer of the goods that they purchased through the retailer could be forced into arbitration based on the web site's arbitration provision. Likewise, the manufacturer may be dismayed to find out that thousands of consumers may be able to force it to arbitrate their claims pursuant to an arbitration agreement it never signed or authorized, requiring them to incur the substantial fees for those arbitrations.[9] (See *JSM Tuscany, supra*, 193 Cal.App.4th at p. 1241 ["A nonsignatory plaintiff can be compelled to arbitrate a claim even against a nonsignatory defendant, when the claim is itself based on, or inextricably intertwined with, the contract containing the arbitration clause"].) There is nothing fair about imposing arbitration under these circumstances. (Cf. *Mahram v. The Kroger Co.* (2024) 104 Cal.App.5th 303, 312 [nonsignatory lacked standing as third-party beneficiary to enforce

---

[9]     If, as Ford contends, a nonsignatory manufacturer may enforce an arbitration provision in a contract between a buyer of the manufacturer's product and a third party because the manufacturer's warranties must be deemed obligations of that contract, then the buyer should be able to enforce that provision against the manufacturer as well. Indeed, it would be inequitable to conclude otherwise. (See Civ. Code, § 3521 ["A person who takes the benefit must bear the burden"].)

arbitration provision between online retailer and customer].) We therefore see no basis under longstanding California contract law for applying equitable estoppel here.[10]

### III. DISPOSITION

The order is affirmed.

---

[10] At oral argument, Ford sought leave to file supplemental briefing on the broader equitable justifications for our conclusion, which had been communicated to the parties in our Tentative Opinion. We deny Ford's request. Government Code section 68081 gives parties an opportunity for supplemental briefing if this court is deciding an appeal "based upon an issue which was not proposed or briefed by any party to the proceeding." But that does not pertain to issues that can be considered "fairly included" within the issues raised. (*People v. Alice* (2007) 41 Cal.4th 668, 679.) Ford's briefs raised the issue of how equitable estoppel theory should be applied, which fairly (if not necessarily) includes the broader issue of whether Ford's position would result in inequity. Certainly, the parties to this appeal could expect that we would consider the broader consequences of their positions. Furthermore, Ford did not indicate at oral argument that it had anything more to express in writing than it expressed orally even though it received our Tentative Opinion almost two weeks earlier.

                                                                CHOU, J.


We concur.


JACKSON, P. J.
BURNS, J.


(A172271)

**Ballesteros v. Ford Motor Company et al. (A172271)**

Trial Judge:      Hon. Thomas S. Garza

Trial Court:      San Bernardino County Superior Court

Attorneys:

        Shook Hardy & Bacon, Andrew L. Chang, Amir Nassihi, Ryan Killian, and Nalani Crisologo for Defendant and Appellant.

        The Lemon Pros, Arash Khorsandi, Michael Saeedian, and Christopher Urner; Esner, Chang, Boyer & Murphy, Stuart B. Esner and Kevin N. Nguyen for Plaintiff and Respondent.